# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP1362-CR |

COMPLETE TITLE: State of Wisconsin,
　　　　　　　　　　Plaintiff-Respondent-Petitioner,
　　　　　v.
Jovan T. Mull,
　　　　　　　　　　Defendant-Appellant.

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 401 Wis. 2d 195, 973 N.W.2d 14
(2022 – unpublished)

| | |
|---|---|
| OPINION FILED: | April 4, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 29, 2022 |

SOURCE OF APPEAL:
　COURT: Circuit
　COUNTY: Milwaukee
　JUDGE: Joseph R. Wall & Jonathan D. Watts

JUSTICES:
ROGGENSACK, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. DALLET, J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Christine A. Remington,* assistant attorney general, with whom on the briefs was *Joshua L. Kaul,* attorney general. There was an oral argument by *Christine A. Remington,* assistant attorney general.

For the defendant-appellant, there was a brief filed by *Christopher P. August,* assistant state public defender. There

was an oral argument by *Christopher P. August,* assistant state public defender.

**2023 WI 26**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP1362-CR
(L.C. No. 2015CF2419)

STATE OF WISCONSIN          :      IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

    **v.**

**Jovan T. Mull,**

    **Defendant-Appellant.**

**FILED**

**APR 4, 2023**

Sheila T. Reiff
Clerk of Supreme Court

---

ROGGENSACK, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. DALLET, J., filed a dissenting opinion.

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, J. We review an unpublished, per curiam decision from the court of appeals.[1] The court of appeals granted defendant Jovan T. Mull a new trial because it concluded Mull received ineffective assistance of

---

[1] State v. Mull (Mull II), No. 2020AP1362-CR, unpublished slip op., (Wis. Ct. App. Feb. 1, 2022) (per curiam).

counsel at his trial, which resulted in his conviction for first-degree reckless homicide.[2]

¶2    We conclude that Mull's trial counsel did not perform deficiently.  Because we make this determination, we need not assess whether counsel's performance prejudiced the defense.  Lastly, we decline Mull's request to grant him a new trial in the interest of justice because the controversy was fully tried, and it is not probable that justice has miscarried.  Accordingly, we reverse the court of appeals.

## I.  BACKGROUND

### A.  The Incident

¶3    Ms. Ericka Walker was shot and killed in her bedroom during a crowded house party in the early morning hours of March 7, 2015, when a fight bordering on a brawl erupted.  Eyewitness accounts are consistent so far as the general details of the evening, but differ significantly regarding the specifics.

¶4    Most accounts describe the initial outbreak of a small, personal fight, which subsided only to swell into a larger clash almost immediately.  The fight escalated quickly from grabbing, to pushing, to throwing dishes, to the use of one or multiple tasers.  A few people and Ms. Walker, who by most accounts was not involved in the fight, sheltered in a bedroom off of the main living area where the fight was taking place.  Seeing a roommate engaged in the fight, Ms. Walker pulled him

---

[2] The Honorable Jonathan D. Watts of Milwaukee County presided and entered the judgment of conviction.

2

and his friend into the bedroom with her.    However, the pair continued to fight, throwing objects at people standing outside the bedroom's main door from a second door to the bedroom.    The fight culminated when someone fired multiple shots into the bedroom through the closed door, striking and killing Ms. Walker.    Ms. Walker's autopsy confirmed she was struck by six bullets.

### B.    The Investigation

¶5    Police arrived on scene and began investigating the shooting immediately.    Witness accounts suggest that 40 to 100 people attended the party, and police obtained statements from more than 25 individuals.    Eyewitness descriptions identified the person who shot through the door as a black male who fired the gun with his right hand, but descriptions were otherwise very inconsistent.

¶6    The array of witness statements described the shooter as 16-24 years old, 5'2"-5'11" tall, slim, medium or stocky build, with a medium or dark complexion.    Investigators were told the shooter had short dreads, a short "afro," a four-inch "afro," and "short, curly hair."    Numerous people described the shooter as wearing a red sweatshirt, although some reported the sweatshirt was "Adidas" brand, while others told investigators it was a Wisconsin Badgers sweatshirt.    Two people told police the shooter wore a blue sweatshirt.    Three individuals reported seeing the shooter in a black or dark sweatshirt, while another person reported the shooter was in a white t-shirt.    The shooter

was described as wearing red Rock Revival pants while others reported the shooter wore black pants or blue jeans.

¶7 Accounts varied as to how many people were outside the bedroom. One witness placed two individuals outside the bedroom, both with guns and one in an orange shirt. Others told police three to eight men were looking for the two individuals Ms. Walker pulled into the bedroom. Reports also varied as to whether the lights were on or off in the living room during the fight. Nearly all accounts, however, suggested Vashawn Smyth[3] and his friend Menjuan Bankhead were involved in the initial stages of the fight.

¶8 Shortly after the party, rumors began circulating on Facebook accusing Smyth of firing his gun into the door. A mysterious Facebook user contacted Ms. Walker's former girlfriend Cheyenne Pugh to convey that Smyth was the person who shot through the door. Pugh reported this information to police. Witness Keshawna Wright told officers she had seen Smyth shoot into the door at the party. Police initially investigated and arrested Smyth for Ms. Walker's death. Smyth remained adamant that he did not have a gun while at the party. Smyth first told officers he was already leaving the house when

---

[3] The record reflects numerous alternate first and last name spellings for many subjects involved. We use the spelling used at trial for those who testified or the most common spelling that appears in the record. Further, many individuals have nicknames, but as the record connects an individual's name and nickname, and neither party disputes this, we proceed using what appeared to be each person's legal name.

4

the shooting began, but in later interviews he told investigators he was in the house when someone shot through the door. One individual involved in the fight did not identify Smyth in a lineup in which he was the target. Smyth is right-handed.

¶9 Witness Jalyn Lynch reported that he saw two people holding guns at the party and identified one of them as Bankhead. Lynch told officers that Bankhead did not shoot into the door, but rather he shouted to the other person with a gun to shoot through the door. Witness Wright did not identify Bankhead in a lineup for which he was the target. Officers arrested Bankhead as a felon in possession of a firearm. Bankhead told officers he wore a red Wisconsin Badgers sweatshirt on the night of the party. The record does not reflect why investigators turned their attention from Bankhead.

¶10 During one interview, Smyth told officers Tyler Harris[4] displayed a handgun to Smyth from across the room at the party minutes before someone shot through the door. Smyth reported to investigators that Tyler Harris later told him he "emptied [his] clip" at the party. Shortly after, Tyler Harris changed his Facebook status to indicate he needed to "stay low." Witness Channel Howard identified Tyler Harris in a photo array as the "person [she] saw in possession of a gun at [the] party." Officers arrested Tyler Harris as a felon in possession of a

---

[4] There are four individuals with the last name Harris in the record: Tyler, Sanchez, Demon, and Dejuan. For clarity, we refer to each individual by his full name.

firearm. The record does not reflect why investigators turned their attention from Tyler Harris.

¶11 A few days after the incident, Pugh began hearing new rumors that Jovan Mull was the person who shot Ms. Walker through the door. Pugh received photos of Mull from unknown senders who said the person in the photo was the shooter. Pugh brought that information to investigators' attention, too.

¶12 The investigation then focused on Mull. Witness Lynch stated he did not remember seeing Mull at the party, although others recalled seeing him there. Three individuals——Sanchez Harris, Alphonso Carter, and Desmond Butler——separately identified Mull in a photo array as the person who shot through the door. Four people——Demon Harris, Tyler Harris, Charles Cantrell, and Elicia Burrows——did not recognize or identify Mull as the shooter in separate photo arrays. Smyth told investigators Mull was "the person that had the gun in the kitchen," although he did not identify Mull as the shooter. Smyth also told investigators that he and Mull did not have an amicable history.

¶13 Additional accounts implicated Mull. Sanchez Harris told investigators that Mull said he had a gun on him while they rode to the party together. Sanchez Harris further told officers Mull "did the shooting," but also that, Mull "had to be" the shooter. Vachune Hubbard told investigators that he had spoken with Mull shortly after the party and Mull said that at the party, "[T]hey got to fighting, so I got to shooting," and "I shot through the door." Mull is right-handed.

6

¶14 The State ultimately charged Mull with first-degree reckless homicide for Ms. Walker's death.

### C. Mull's Trial

¶15 A four-day jury trial took place in April 2016. The State presented multiple witnesses, including witnesses who attended the party, witnesses who did not attend the party, and investigators. The defense did not call any witnesses independently.[5]

¶16 The State called Ms. Walker's former girlfriend, Pugh, who did not attend the party. On direct examination, the State questioned Pugh regarding Facebook messages and a photo of Smyth that Pugh received and brought to police regarding the shooter's identity. Counsel objected on foundation and hearsay grounds multiple times during Pugh's testimony. In one instance, Pugh read a message on the stand to which defense counsel made a

---

[5] The defense submitted a witness list that identified nine individuals. Of those nine individuals, eight were cross-listed on the State's witness list. The ninth, and the only name that was not cross-listed, was "Donika Payton," which may be an alternate spelling of "Donieka Payton." Review of the record is inconclusive as to whether Donika and Donieka are actually the same person.

Assuming they are the same person, all individuals identified on the defense's witness list were also identified on the State's witness list. Of the eight individuals on the defense's witness list, the record supports that neither the State nor the defense subpoenaed five of those witnesses. The State subpoenaed the remaining three individuals on the defense's list——Sanchez Harris, Elicia Burrows and Keshawna Wright. Sanchez Harris appeared and testified at trial, but the record reflects Burrows and Wright could not be located after multiple attempts.

7

hearsay objection. The State explained the message was offered "to explain further [officers'] investigation." The court overruled all of the defense's objections. Pugh then testified that others told her Mull was the shooter. Pugh received a text with a photo of Smyth, and another person sent her a photo of Mull on Facebook. Pugh testified she brought this information to investigators.

¶17 On cross-examination, Pugh confirmed she did not know the person who sent her a Facebook message and photo of Smyth, nor the person who sent her a photo of Mull. Pugh's responses included references to "they" or "them," which Mull's counsel sought to clarify for the court reporter. His subsequent questions resulted in the following exchange and statement from Pugh:

> [Trial counsel]: And then you talked about, "They." Is there another person the message is going to?
>
> [Pugh]: It's not actually on my messenger. It was just other people coming up to me about the situation and sending [their] love out I guess about talking to me and say they apologize for her death and stuff like that.
>
> And also another lady was telling me about him going -- being in the hood bragging about it saying that he hit a lick over there on 35th and he killed the stud bitch.
>
> [Trial counsel]: I guess. Just could you define what that means?
>
> [Pugh]: Stud. It's a female who dresses like a guy.

Trial counsel did not move to strike Pugh's testimony, nor did he move for a mistrial. Instead, trial counsel pivoted to

8

explore Pugh's relationship to the investigation. The jury heard additional testimony from Smyth, Sanchez Harris, Carter, Butler, and Hubbard.

¶18 Smyth testified that he attended the party, and he described the events culminating in the "big brawl." Smyth also testified that he saw two people with guns in the living room——Mull and Tyler Harris. Smyth told the jury he heard the shots fired, but that he did not actually see Mull fire a gun.

¶19 Sanchez Harris testified that Mull rode to the party with Sanchez Harris and his brothers, and that Mull announced he had a gun on him. Sanchez Harris stated he was in the living room when Ms. Walker was shot, and he saw one person wearing a red sweatshirt pointing a gun at the bedroom door. Sanchez Harris testified Mull was also in the vehicle when they left the party and Mull said, "You better not say anything. I know your faces." He testified that Mull wore a red Wisconsin Badgers sweatshirt the night of the party, and the State entered Sanchez Harris's prior identification of Mull in a photo array from the investigation into evidence.[6] He testified that Mull was "the person who probably did it."

---

[6] Sanchez Harris testified he was shown only two photos in the photo array, and that he identified Mull's photo as the person who shot through the door. Whether there was a problem with the photo array is not before us for review. The prosecutor walked Sanchez Harris through the photo array identification form that he signed, where his circled responses indicate he viewed six photos.

¶20 Carter testified he was at the party and that he saw two men outside the bedroom door with guns. One man told the other to "[s]hoot in there," and the other person shot through the door. The State admitted Carter's prior positive identification of Mull as the shooter in a photo array.

¶21 Butler testified he was at the party and that he recalled the shooter wearing a red sweatshirt. The prosecution admitted Butler's prior identification of Mull from a photo array. However, after seeing Mull in the courtroom, Butler recanted his identification because he did not believe Mull looked like the person he identified in the photo array. "As I'm looking at [Mull], the height even different like. The body language. I'm looking. I don't want to convict nobody that's innocent."

¶22 Hubbard did not attend the party, but he testified in accordance with the statements he made to officers during the investigation. Namely, Hubbard affirmed that he previously told investigators that Mull told him "I got to shooting" at the party and "I shot through the door."

¶23 The jury found Mull guilty of first-degree reckless homicide. Mull subsequently received a bifurcated sentence of twenty-five years initial confinement and ten years extended supervision.

D. Procedural History

¶24 Mull timely filed for postconviction relief seeking a new trial based on grounds that included ineffective assistance of counsel and the interest of justice. The circuit court denied the postconviction motion without a hearing,[7] which Mull appealed. The court of appeals reversed[8] and ordered the circuit court to conduct a Machner[9] hearing. Specifically, the court concluded Mull was entitled to a Machner hearing regarding his allegations that trial counsel was ineffective for the two claims we review today.

¶25 First, Mull asserted his trial counsel was ineffective for "failing to file a third-party perpetrator motion regarding any one of the viable alternate suspects." (Emphasis in original.) Mull identified Smyth, Tyler Harris, and/or Bankhead as potential third-party perpetrators that Mull could have named consistent with a Denny[10] defense.

---

[7] The Honorable Jeffrey A. Conen entered the order denying Mull's postconviction motion.

[8] State v. Mull (Mull I), No. 2018AP1349-CR, unpublished slip op., ¶1 (Wis. Ct. App. July 23, 2019).

[9] State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). "The evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain his or her handling of the case, is . . . called a Machner hearing." State v. Balliette, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

[10] State v. Denny, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984). A Denny defense permits a defendant to raise a third-party perpetrator defense if the defendant can show "a 'legitimate tendency' that the third person could have committed the crime." Id. at 623. A third-party perpetrator defense

11

¶26  At the Machner hearing,[11] trial counsel testified he thought pursuing a reasonable doubt defense was preferable to pursuing a third-party perpetrator defense because it was difficult to locate witnesses to interview them.  Trial counsel testified to an "inability to contact certain witnesses to prepare a Denny motion pretrial," even with the help of an investigator.  Trial counsel said "a lot of these people wouldn't return phone calls, went by nicknames, [and Mull] did not have phone numbers . . . or addresses."  Trial counsel was aware the State also had difficulty locating witnesses.  Based on this information, trial counsel determined there were a lot of credibility issues and inconsistent accounts of what happened, which he strategically thought presented a reasonable doubt defense.  Trial counsel also testified that he had prepared two Denny motions for clients in other cases, both of which were denied.

¶27  Secondly, Mull argued trial counsel was ineffective for failing to object or move to strike Pugh's testimony.  Mull found his attorney's failure to strike Pugh's hearsay testimony that "he" was "saying that . . . he killed the stud bitch," particularly deficient and prejudicial.  At the Machner hearing, trial counsel testified that he "objected to the line of questioning," relative to the out-of-court messages the

requires motive, opportunity, and a direct connection to the crime.  Id. at 625.

[11] The Honorable Joseph R. Wall presided at the hearing and issued the subsequent order.

prosecution presented through Pugh. "The judge had overruled," both on foundation and hearsay grounds. Relative to the hearsay objection, the court allowed Pugh's testimony as course-of-investigation testimony. Having been overruled, trial counsel explained he attempted to discredit Pugh's testimony through cross-examination by attacking her credibility and questioning Pugh's motive in testifying. Trial counsel testified he did not object, as the statement came out on his own cross-examination of Pugh, and he did not move to strike the statement because he did not want to "[bring] too much attention to the jury" regarding Pugh's testimony.

¶28 The circuit court made a number of relevant factual findings, which we discuss below. The court found trial counsel credible, and it accepted his testimony. The circuit court concluded "the errors asserted by the defense" did not rise to the established standard of prejudice for ineffective assistance of counsel. The circuit court accordingly denied Mull's postconviction motion for a new trial following the Machner hearing.

¶29 Mull appealed the circuit court's denial to the court of appeals. Mull renewed his ineffective assistance of counsel claims and his argument seeking a new trial in the interest of justice. The court of appeals reversed and granted Mull a new trial after it concluded Mull received ineffective assistance. State v. Mull (Mull II), No. 2020AP1362-CR, unpublished slip op., ¶1 (Wis. Ct. App. Feb. 1, 2022). The court of appeals determined trial counsel was ineffective for failing to present

13

a third-party perpetrator defense, and for "failing to move to strike or move for a mistrial following hearsay testimony" from Pugh. Id. The court of appeals remanded for a new trial without addressing Mull's interest of justice claim.

¶30 The State petitioned us for review on two questions that largely reflect the claims Mull raised below. First, whether the court of appeals impermissibly failed to defer to trial counsel's strategic decisions; and second, whether this court should grant Mull a new trial in the interest of justice.

II. DISCUSSION

A. Standard of Review

¶31 "An ineffective assistance of counsel claim presents a mixed question of fact and law." State v. Pico, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. We do not reverse a circuit court's finding of fact unless it is clearly erroneous. Id. "Findings of fact include 'the circumstances of the case and the counsel's conduct and strategy.'" Id. (quoting State v. Thiel, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305). Whether those facts demonstrate that counsel's performance fell below the constitutional standard is a matter of law subject to our independent review. State v. Pitsch, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).

¶32 We may exercise our discretion to grant a new trial in the interest of justice "[u]nder both our inherent powers and our statutory authority." State v. Armstrong, 2005 WI 119, ¶114, 283 Wis. 2d 639, 700 N.W.2d 98; see also State v. Avery, 2013 WI 13, ¶23, 345 Wis. 2d 407, 826 N.W.2d 60; Wis. Stat.

14

§ 751.06 (2021-22).[12]   We recognize that "a circuit court is in a better position than an appellate court to determine whether confidence in the correctness of the outcome at the original trial or hearing has been undermined."  Morden v. Cont'l AG, 2000 WI 51, ¶87, 235 Wis. 2d 325, 611 N.W.2d 659.  Because of that, we approach a request for a new trial "with great caution."  Armstrong, 283 Wis. 2d 639, ¶114.

## B.   Ineffective Assistance of Counsel

¶33  The court of appeals reviewed Mull's two arguments, which are renewed before us.  Mull asks us to affirm the court of appeals' conclusion that his trial counsel was ineffective for failing to present a third-party perpetrator defense and for failing to move to strike or move for a mistrial in light of Pugh's testimony.

¶34  The Sixth Amendment of the United States Constitution guarantees the effective assistance of counsel to every criminal defendant.  U.S. Const. amend. VI; Pico, 382 Wis. 2d 273, ¶18.  The purpose of the guarantee is "to ensure that criminal defendants receive a fair trial," and "to justify reliance on the outcome of the proceeding."  Strickland v. Washington, 466 U.S. 668, 689, 692, (1984).  A defendant is denied the right to effective assistance of counsel when "his counsel performs deficiently" and "the deficiency prejudices his trial."  Pico, 382 Wis. 2d 273, ¶18.

---

[12] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

15

¶35 Counsel performs deficiently if his "conduct falls outside [an] objectively reasonable range," which we recognize is "wide." Id., ¶19. We apply a "strong presumption" that counsel acts "reasonably within professional norms." State v. Coleman, 2015 WI App 38, ¶20, 362 Wis. 2d 447, 865 N.W.2d 190. We are "highly deferential" to counsel's decisions, provided they are objectively reasonable and strategic. State v. Breitzman, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93. However, we do not review the reasonableness of trial counsel's decisions with "the benefit of hindsight." Pico, 382 Wis. 2d 273, ¶22. We will not "second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment." Breitzman, 378 Wis. 2d 431, ¶65 (brackets in original). We cannot decide after-the-fact that "a more appropriate decision could have been made." State v. Felton, 110 Wis. 2d 485, 502-03, 329 N.W.2d 161 (1983).

¶36 On the other hand, it is not enough to merely "label" counsel's challenged decisions "a matter of choice and of trial strategy." Id. at 502. Rather, we examine trial counsel's choices "in the context of the circumstances as they existed at the time he made his decisions." Pico, 382 Wis. 2d 273, ¶22. See also Felton, 110 Wis. 2d at 502-03.

¶37 Counsel's deficient performance prejudices a criminal defendant when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

16

probability sufficient to undermine confidence in the outcome." Pitsch, 124 Wis. 2d at 642 (quoting Strickland, 466 U.S. at 669).

### 1. Third-Party Perpetrator Defense

¶38 We begin by reviewing whether trial counsel was deficient in choosing a "reasonable doubt" trial strategy over a "third-party perpetrator" defense strategy. Before we proceed to the merits of Mull's argument, we first review the boundaries and requirements of a third-party perpetrator defense.

¶39 Due process requires the government to bear the burden of proving an accused's guilt beyond a reasonable doubt in order to convict. In re Winship, 397 U.S. 358, 364 (1970). While an accused is not obligated to present a defense, the United States and Wisconsin Constitutions provide a criminal defendant the due process right to "present a theory of defense to the jury." State v. Wilson, 2015 WI 48, ¶3, 362 Wis. 2d 193, 864 N.W.2d 52. An accused may present a theory of defense that another party committed the crime for which an accused stands trial. Such a defense, however, must be grounded in admissible evidence. Accordingly, an accused's right to present a defense does not encompass the right to present irrelevant evidence. State v. Scheidell, 227 Wis. 2d 285, 294, 595 N.W.2d 661 (1999).

¶40 When dealing with stakes as high as a defendant's liberty, third-party perpetrator evidence walks a bit of a tightrope. On the one hand, evidence of another's guilt is

17

always relevant to an accused's innocence;[13] on the other hand, a trial should avoid "undue diversion . . . by injecting a collateral issue, and in avoiding unsupported jury speculation regarding the guilt of other suspects."[14]  Id. at 303.  "It is this tension between the defendant's rights and the relevancy requirement that the court of appeals addressed in Denny." Wilson, 362 Wis. 2d 193, ¶48 (referencing State v. Denny, 120 Wis. 2d 614, 622, 357 N.W.2d 12 (Ct. App. 1984)); see also Wilson, 362 Wis. 2d 193, ¶102 (Ziegler, J., concurring).  There, the court adopted the "legitimate tendency" test to guide the admissibility of third-party perpetrator evidence in Wisconsin. Denny, 120 Wis. 2d at 623-24.[15]

¶41  Denny established a three-prong test to ensure a defendant's proffered evidence does not change the proceedings "into a trial of collateral issues."  Denny, 120 Wis. 2d at 624.

---

[13] Wisconsin Stat. § 904.01 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[14] See also Wis. Stat. § 904.03, which states in pertinent part, "[R]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

[15] Although we ratified the Denny "legitimate tendency" test in State v. Knapp, and reaffirmed it in State v. Wilson, third-party perpetrator evidence is commonly known as "Denny evidence," used to present a "Denny defense."  State v. Knapp, 2003 WI 121, ¶¶175-183, 265 Wis. 2d 278, 666 N.W.2d 881 vacated on other grounds, 542 U.S. 952 (2004); State v. Wilson, 2015 WI 48, ¶52, 362 Wis. 2d 193, 864 N.W.2d 52.

18

To be admissible, the proponent of the evidence must demonstrate that there is "a 'legitimate tendency' that the third person could have committed the crime" by establishing the third person had the motive, opportunity, and a direct connection to the crime charged. Id. at 623, 624.[16]

¶42 We have never addressed whether a criminal defendant may present a Denny defense implicating more than one alternative suspect. Assuming, without deciding, that a criminal defendant may present a third-party perpetrator defense that implicates multiple alternative suspects, we turn to Mull's argument before us.[17] Mull's postconviction counsel argues trial

---

[16] See generally id, ¶¶62-72, for a detailed discussion of each requirement necessary to establishing "legitimate tendency."

[17] We have reviewed decisions from other jurisdictions where arguments regarding multiple alternative suspects were permitted.

Often, a defendant was unable to present evidence regarding multiple alternative perpetrators merely because his proffered third-person perpetrator evidence did not pass the respective jurisdictional test for admissibility, not because of a per se rule prohibiting as much. See generally Andrews v. United States, 179 A.3d 279, 294-95, 296 (D.C. Cir. 2018) (defendant argued counsel was ineffective for not presenting third-party perpetrator defense regarding two alternative suspects; appellate court reviewed admissibility as to both and ultimately determined the evidence did not survive the jurisdiction's test for either person); United States v. Moore, 590 F. Supp. 3d 177, 181-82 (D.D.C. 2022) (same); People v. Elmarr, 351 P.3d 431, ¶¶5, 13 (Colo. 2015) (defendant proffered evidence of six alternative suspects in wife's homicide, which the circuit court held inadmissible; the court of appeals concluded that evidence of alternative suspects one and six were admissible); Commonwealth v. Rodriguez, 174 A.3d 1130, 1146 (Pa. Super. Ct. 2017) (accused's attempts to proffer evidence of two known alternative suspects deemed inadmissible because it did not meet

19

counsel was deficient for failing to present a Denny defense that implicated one or more alternative suspects. While we appreciate that is counsel's argument, what we review, however, is whether trial counsel's strategy to present a reasonable doubt defense was objectively reasonable.

¶43 We begin with the circuit court's factual findings regarding Mull's trial counsel. The circuit court found trial counsel credible and accepted his testimony at the Machner hearing. The court also found that Mull was involved in the decision to pursue the reasonable doubt defense, and that preparing a Denny motion would have been difficult due to challenges in locating or interviewing individuals.

¶44 Regarding a Denny defense that Smyth was the shooter, the circuit court found "it was difficult to locate witnesses who would have supported the defense." The court found that Keshawna Wright, who identified Smyth as the shooter, had become uncooperative with authorities a few weeks after the shooting, and that the State showed numerous unsuccessful attempts to subpoena her.

¶45 Mull's postconviction counsel argued a Denny defense implicating Bankhead could be premised on Jalyn Lynch's statement to police. Lynch identified Bankhead as standing outside the door telling another individual to shoot through it.

jurisdictional test of admissibility); State v. Grega, 721 A.2d 445, 456 (Vt. 1998) (same, for two alternative suspects); Grady v. State, 197 P.3d 722 (Wyo. 2008) (same, for three of four alternative suspects).

20

The circuit court found "the only inference to be drawn from that is [Bankhead] is yelling that to somebody else," and was not the shooter.

¶46 Regarding a Denny defense that Tyler Harris was the shooter, the circuit court made two findings. First, that Smyth did not testify during Mull's trial that Tyler Harris told Smyth he "emptied his clip" because the State objected to the statement as hearsay, which objection was sustained.[18] Secondly, the court noted Channel Howard identified Tyler Harris in a photo array as "in possession of a gun at [the] party." Despite Howard's identification of Tyler Harris by his nickname, demonstrating she knew him, she did not identify him as the shooter.

¶47 Our review of the record supports the circuit court's findings related to a Denny defense implicating Smyth, Bankhead, and/or Tyler Harris. Accordingly, because the circuit court's findings are not clearly erroneous, we accept them. State v. Tourville, 2016 WI 17, ¶16, 367 Wis. 2d 285, 876 N.W.2d 735.

¶48 After accepting the circuit court's factual findings as not clearly erroneous, we independently determine whether trial counsel's decision to present a reasonable doubt defense

---

[18] Mull's postconviction counsel contends trial counsel could have used Tyler Harris's statements at trial as admissible statements of an unavailable declarant pursuant to Wis. Stat. § 908.045. We do not address this argument because we review whether counsel's defense strategy was objectively reasonable, not whether it was legally possible to present a different defense.

was objectively reasonable and therefore, not deficient. We accordingly examine the record to assess whether trial counsel's decision falls within the "objectively reasonable range" we discussed in Pico, 382 Wis. 2d 273, ¶19. We do so "as if we were encountering [the circumstances] just as trial counsel did, making every effort to ensure our knowledge of the present does not affect how we assess what was known to him at the time." Id., ¶22. We agree with Mull's counsel's statement at oral argument that we "have to look at counsel's reasoning process. It is not sufficient to just take his explanations at face value." In determining whether trial counsel's performance was objectively reasonable, we do not rely on a "blanket policy of deference." E.g., Coleman, 362 Wis. 2d 447, ¶20.

¶49 After reviewing the investigatory materials available to trial counsel at the time he decided on Mull's defense, we agree with trial counsel's summary at the Machner hearing:

> [T]here was a lot of other people [] giving conflicting statements as to who the shooter was . . . other people with guns in the party . . . other people who were shooting outside after the incident.
>
> Different people had identified other shooters, [] there were different descriptions of outfits given by various people.
>
> . . . .
>
> When you got multiple people with guns, multiple people giving bad descriptions especially considering a lot of them had been smoking marijuana or drinking, it goes to their ability to perceive and recall . . . .

22

The record demonstrates Mull's representation was reassigned to new trial counsel seven months after the shooting. Combining all of those facts with the lapse of time since witnesses gave strikingly inconsistent statements, we recognize the circumstances trial counsel faced. Pico, 382 Wis. 2d 273, ¶19. We conclude that trial counsel's trial strategy to cast doubt on the State's case against Mull was not outside an objectively reasonable range of performance. State v. Kimbrough, 2001 WI App 138, ¶31, 246 Wis. 2d 648, 630 N.W.2d 752. That a different trial strategy may look better in hindsight does not render a reasonable strategy deficient performance. Felton, 110 Wis. 2d at 502.

¶50 The court of appeals (Mull II) failed to review whether trial counsel's decision to pursue a reasonable doubt defense was objectively reasonable. Instead, it determined a third-party perpetrator defense was preferable to the defense trial counsel presented. The court of appeals stated:

> [I]n pursuing the reasonable doubt defense, trial counsel merely highlighted the discrepancies and inconsistences in the witness accounts without providing an alternative theory to explain those discrepancies. A decision to present a third-party perpetrator defense would have turned an argument that the witnesses gave conflicting descriptions of what Mull was wearing and what Mull was doing into a defense that it was someone other than Mull who was firing shots at the bedroom door.

Mull II, No. 2020AP1362-CR, ¶38. However, the court of appeals did not "make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

23

counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Breitzman, 378 Wis. 2d 431, ¶65 (quoting State v. Domke, 2011 WI 95, ¶36, 337 Wis. 2d 268, 805 N.W.2d 364).  Trial counsel was not obligated to make sense of the State's case or to "explain the discrepancies" in the State's evidence against Mull.[19]

¶51 Rather, we review whether trial counsel's reasonable doubt defense strategy was objectively reasonable based on the totality of circumstances at the time counsel made the defense decision.  Brietzman, 378 Wis. 2d 431, ¶65.  We conclude that drawing attention to discrepancies in the State's case through vigorous cross-examination of witnesses who appeared was an objectively reasonable trial strategy under the circumstances trial counsel faced.

¶52 Mull also argues trial counsel's investigation into witness statements was insufficient, and therefore deficient. "In assessing the reasonableness of an attorney's investigation [] a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins v. Smith, 539 U.S. 510, 527 (2003).  Trial counsel reviewed more than 140 pages of witness statements provided to

---

[19] See Wis. JI——Criminal 140 ("Defendants are not required to prove their innocence . . . .  The burden of establishing every fact necessary to constitute guilt is upon the State . . . .  If [the jury] can reconcile the evidence upon any reasonable hypothesis consistent with the defendant's innocence, [the jury] should do so and return a verdict of not guilty.").

investigators, and the statements varied significantly. An attorney's decision to refrain from investigating inconsistent witness statements further may be reasonable if he believed the statements differed enough to cast reasonable doubt on the State's case against his client. Given the facts of this case, trial counsel's decision to refrain from expending resources on further investigation compared to preparing a reasonable doubt defense was objectively reasonable.

¶53 Because Mull's trial attorney did not perform deficiently, we need not address whether trial counsel's performance prejudiced Mull at his trial. Pico, 382 Wis. 2d 273, ¶20 ("The court need not address [the prejudice] prong if the petitioner fails to satisfy the [deficient performance] prong.").

## 2. Pugh's Testimony

¶54 The State appeals the court of appeals' (Mull II) determination that trial counsel was ineffective in handling Pugh's testimony. Specifically, the court of appeals (Mull I) stated Mull was entitled to a Machner hearing on the allegation "that trial counsel was ineffective for failing to move to strike or for a mistrial following Cheyenne Pugh's statement on cross-examination to the effect that Mull had bragged about shooting [Ms. Walker]." Mull I, No. 2018AP1349-CR, ¶49. That is what the Machner hearing addressed, what the circuit court reviewed in determining that Mull received effective assistance, and what we must review on appeal.

25

¶55 Mull asks us to conclude that his attorney's failure to address Pugh's statement that she received a message stating Mull bragged about killing the "stud bitch" was "objectively unreasonable" as a matter of law. Mull argues it casts him as confessing, boasting about killing, and using a disparaging term to describe the victim.

¶56 We begin our review with the circuit court's order on Mull's postconviction motion; we accept the court's factual findings as true, unless clearly erroneous, and we independently decide whether the facts amount to ineffective assistance of counsel. Kimbrough, 246 Wis. 2d 648, ¶27. We do so because a trial court is "free to accept or reject all or any portion of defense counsel's testimony as it deemed credible." Id., ¶29. Factual findings include "the circumstances of the case and the counsel's conduct and strategy." State v. Jenkins, 2014 WI 59, ¶38, 355 Wis. 2d 180, 848 N.W.2d 786.

¶57 The circuit court found trial counsel to be credible based on his testimony and the record as a whole. The circuit court also made two factual findings regarding trial counsel's strategy: (1) that his strategy was to discredit Pugh and to attack the foundation of the electronic messages; and (2) that trial counsel did not want to draw the jury's attention to Pugh's statement. See id., ¶38 (stating "counsel's conduct and strategy" are findings of fact). We do not reverse these findings because they are not clearly erroneous after our review of the record. Kimbrough, 246 Wis. 2d 648, ¶27.

26

¶58 In light of those findings, we independently review whether counsel's decision to discredit Pugh via cross-examination and whether electing not to object or move to strike were outside the "wide range of reasonable professional assistance." Pico, 382 Wis. 2d 273, ¶19 (quoting Strickland, 466 U.S. at 689). We recognize:

> There are [] 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach.

Harrington v. Richter, 562 U.S. 86, 106 (2011) (internal citations omitted). We must make "every effort to reconstruct the circumstances of counsel's challenged conduct, to evaluate the conduct from counsel's perspective and at the time." Jenkins, 355 Wis. 2d 180, ¶36. We next turn to the record to determine the circumstances trial counsel faced.

¶59 On direct examination, the prosecution attempted to introduce screenshots of messages between witness Cheyenne Pugh and a person she knew only online by the name of Sack Casher. Defense counsel objected for lack of foundation. He was overruled. Pugh testified she did not really know who Sack Casher was. Shortly after, Pugh read a message from that same unknown sender while testifying. Trial counsel objected to the statement as hearsay and was overruled. The prosecutor asserted the statement was offered to "explain further [officers'] investigation," and the court instructed the jury the statement

27

was offered to demonstrate "merely that there's a statement that this witness received." The court further explored trial counsel's initial objection based on foundation, and overruled it again. In overruling trial counsel's objection, the court told trial counsel he could "cross-examine regarding the source." Not long after, trial counsel maintained his objection based on foundation to admitting documentation of Pugh's conversation with Casher. He was overruled again. Pugh testified Kia Wade sent her a photo, "[a]nd after [Wade] sent me the picture, she told – she wrote comments that he was in the hood bragging about it." The prosecutor clarified whether that was "all just rumor," to which Pugh replied "yes."

¶60 While cross-examining Pugh, trial counsel asked Pugh a series of questions about the origin of the photos she received implicating Smyth and Mull. Trial counsel elicited that Pugh did not know the person who sent her Smyth's photo. Pugh testified about the likely meaning of one of Casher's messages, "I guess [Smyth] and the young gentlemen . . . had an altercation. And I guess [Casher] was trying to say after that fight that's when I guess he shot through the door but he didn't know that it was Erika."

¶61 These are the circumstances trial counsel faced, and what we must review relevant to his decisions regarding cross-examination of Pugh. Pico, 382 Wis. 2d 273, ¶22. The jury already heard the statement that "he was in the hood bragging about it" was a rumor. Pugh's statement came out while trial counsel probed why a mysterious sender she knew only online

28

blocked her immediately after providing accusatory information. This is consistent with his trial strategy to attack the foundation of Pugh's information. Trial counsel had already objected and been overruled three times during Pugh's testimony——four if we consider the court's return to trial counsel's initial objection.

¶62 We recognize this is a close call. Applying the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," we cannot say that counsel's strategy not to move to strike or move for a mistrial was objectively unreasonable under the circumstances he faced. Id., ¶19 (quoting Strickland, 466 U.S. at 689). Accordingly, trial counsel's performance was not deficient. Even those decisions that appear "unwise in hindsight, will not constitute ineffective assistance of counsel so long as they are 'reasonably founded on the facts and law under the circumstances existing at the time the decision was made.'" State v. Smith, 2016 WI App 8, ¶14, 366 Wis. 2d 613, 874 N.W.2d 610.

¶63 Although Mull accurately argues that discrediting a witness and moving to strike "otherwise inflammatory and prejudicial material" are not "mutually exclusive" strategies, that is not what we review. Rather, we review whether counsel's defense strategies were deficient as a matter of law and prejudicial to the defendant. Strickland, 466 U.S. at 693. Mull must demonstrate that trial counsel's decision to refrain from moving to strike or for a mistrial was either irrational or based on caprice in order to overcome the strong presumption

29

that his trial counsel's strategy was reasonable.  Breitzman, 378 Wis. 2d 431, ¶65.  Mull has not done so.

¶64  Because we conclude trial counsel did not perform deficiently, we do not review prejudice to Mull.  We conclude Mull had the necessary assistance to justify reliance on the jury's verdict.  Strickland, 466 U.S. at 692.

### C.  The Interest of Justice

¶65  In postconviction motions, Mull raised the interest of justice as a basis for a new trial.  The court of appeals did not consider this issue, but both the State and Mull ask us to review his request.

¶66  An appellate court grants a new trial "(1) whenever the real controversy has not been fully tried; or (2) whenever it is probable that justice has for any reason miscarried." State v. Hicks, 202 Wis. 2d 150, 159-60, 549 N.W.2d 435 (1996).

¶67  Under the first scenario, we have said the real controversy has not been fully tried in two situations.  First, when "the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case."  State v. Henley, 2010 WI 97, ¶81, 328 Wis. 2d 544, 787 N.W.2d 350.  Second, when "the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried."[20] State v. Cameron, 2016 WI App 54, ¶31, 370 Wis. 2d 661, 885

---

[20] Mull does not argue that the circuit court had improperly admitted evidence that clouded a crucial issue.

N.W.2d 611.  Under this first category of cases, an appellate court need not make a determination that the "outcome would be different on retrial."  Vollmer v. Luety, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990).

¶68  By contrast, when a claim is made of "a miscarriage of justice," an appellate court must conclude that there is a "substantial probability of a different result on retrial," before granting a new trial.  Id.; Henley, 328 Wis. 2d 544, ¶81; State v. Zdzieblowski, 2014 WI App 130, ¶24, 359 Wis. 2d 102, 857 N.W.2d 622.  We address each issue in turn.

¶69  Mull argues the real controversy was not fully tried because "[i]mportant evidence was left out of the trial."  Mull identifies four categories of evidence that the jury was not given the opportunity to weigh.  First, evidence connecting Smyth and his friends to the shooting, and second, evidence directly implicating Smyth or one of his friends.  These two categories of evidence amount to third-party perpetrator evidence, which merely repackage Mull's ineffective assistance of counsel claims.  We will not address these points further, as we addressed them above.  See State v. Goetsch, 186 Wis. 2d 1, 23, 519 N.W.2d 634 (1994) (Arguments for a new trial in the interest of justice may fail if they simply rehash rejected arguments regarding the ineffective assistance of counsel.).

¶70  Mull next asserts the jury erroneously was not given the opportunity to hear "other evidence tending to exonerate Mr. Mull," but the evidence he identifies focuses on four witnesses discussed earlier.  Keshawna Wright and Elicia Burrows

31

could not be located. While it is true that Charles Cantrell did not identify Mull in a photo array, he also told investigators he "only heard the gun shots but didn't see the shooter." Lastly, Jalyn Lynch's statement to officers that he "didn't remember seeing [Mull] at the party," was based on a "single [Facebook] photo," that police had obtained from Pugh and showed Lynch.

¶71 Finally, Mull argues the jury erroneously was denied the opportunity to hear "evidence tending to call into question Smyth's credibility and believability." We disagree. The jury heard that Smyth's answers were often noncommittal and that Smyth became "agitated with this shit" referring to the prosecutor's and defense counsel's questioning. The jury also heard that Smyth and his friends had been involved in the fight, Smyth was inside the house at the time shots were fired, Smyth "[thought]" he had seen Tyler Harris with a gun in the living room, Smyth had a prior criminal record, had been on probation, was right-handed, and was originally arrested for Ms. Walker's homicide. The jury heard other witnesses discuss the initial stages of the investigation, which focused on Smyth. While Mull now identifies other ways Smyth's credibility could have been attacked while testifying, the jury had ample opportunity to weigh Smyth's credibility and believability. Lastly, we note that whether Smyth was a credible or believable witness was not the "real controversy" of the trial we must review when considering whether to grant a new trial. Avery, 345 Wis. 2d 407, ¶39.

¶72 Rather, the real controversy of the trial was whether Mull was the person who shot through the door and killed Ms. Walker. During closing argument the prosecutor stated, "The big question is identity. . . . Is Mr. Mull the shooter or is the wrong person on trial?" Mull's attorney reiterated "the State is right, this is an issue of identification."

¶73 The jury had the opportunity to hear and consider a plethora of expected and unanticipated evidence over the course of the four-day trial. Butler recanted his identification of Mull as the shooter while on the stand. Hubbard, the person to whom Mull reportedly said, "I shot through the door," stated that a detective "basically like bribed me here" to testify. Witnesses testified about the shooter's clothing, which was not consistent with what witnesses claimed Mull wore that evening. Detectives testified regarding the photo array process and that they did not attempt to "conduct a photo array of the people who had guns" as identified by Smyth.

¶74 The jury was given the opportunity to hear evidence that bore on the central issue of the case before the jury——whether Mull was the shooter or an innocent man. <u>Henley</u>, 328 Wis. 2d 544, ¶81. That was the real controversy.[21] Based on the

---

[21] Contrary to what may have seemed desirable to Mull, the prosecutor could not charge four people with Ms. Walker's death and put them on trial together for the jury to determine who was the shooter. Other jurisdictions have rightfully failed to condone "[t]his gladiator-style trial." <u>People v. Gutierrez</u>, 499 P.3d 367, ¶40 (Colo. App. 2021). "Under our system society carries the burden of proving its charge against the accused . . . . It must establish its case . . . by evidence independently secured through skillful investigation . . . ."

33

evidence presented at trial, we conclude that Mull has "not demonstrated this is an exceptional case requiring our discretionary grant of a new trial because we are satisfied that the real controversy has been fully tried." Cameron, 370 Wis. 2d 661, ¶32.

¶75 Mull asks for a new trial on the grounds that his first trial resulted in a miscarriage of justice. However, Mull's lone paragraph in his brief does little to convince us that a substantial probability of a different outcome awaits him in a new trial. Henley, 328 Wis. 2d 544, ¶81. Instead, Mull rehashes his prior arguments: that the jury did not hear "important evidence to the determination of [Mull's] guilt," and that Mull lacked a meaningful defense. We have already addressed these arguments. Mull also argues that Pugh's hearsay testimony was improperly admitted. Without deciding the issue, we note that even if we assume Pugh's testimony were improperly admitted, it would not warrant the extraordinary remedy Mull seeks. Accordingly, we decline to exercise our exceptional power to grant a new trial in the interest of justice. Armstrong, 283 Wis. 2d 639, ¶114.

### III. CONCLUSION

¶76 We conclude that Mull's counsel at trial did not perform deficiently. Because we make this determination, we need not assess whether counsel's performance prejudiced the

---

Watts v. State of Ind., 338 U.S. 49, 54 (1949). Our system demands "[t]he requirement of specific charges, their proof beyond a reasonable doubt . . . ." Id.

defense. Lastly, we decline Mull's request to grant him a new trial in the interest of justice because the controversy was fully tried below and it is not probable that justice has miscarried for any reason. Accordingly, we reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶77 REBECCA FRANK DALLET, J. *(dissenting)*. When we evaluate whether an attorney's performance was constitutionally ineffective, we must defer to trial counsel's objectively reasonable strategic decisions. See State v. Breitzman, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93. But for that deference to apply, counsel's decisions must be the result of reasoned strategic judgment rather than a mere "post hoc rationalization" for counsel's conduct. Wiggins v. Smith, 539 U.S. 510, 526 (2003).

¶78 In this case, Jovan Mull alleges two "strategic" decisions made by counsel at his first-degree reckless homicide trial were ineffective: (1) Relying on a run-of-the-mill reasonable doubt defense when a far more compelling third-party perpetrator (Denny[1]) defense was possible based on the ample evidence that someone other than Mull committed the crime; and (2) not challenging the admission of Mull's alleged hearsay confession and then eliciting further details about it.

¶79 I reluctantly agree with the majority that, in light of the circuit court's factual findings, counsel's decision to pursue a reasonable doubt defense was objectively reasonable. See majority op., ¶51. The same cannot be said, however, of counsel's decisions regarding Mull's alleged hearsay confession. Because I conclude that counsel's performance on that score was deficient and prejudicial, I respectfully dissent.

---

[1] See State v. Denny, 120 Wis. 2d 614, 357 N.W.2d 12 (Ct. App. 1984) (setting forth various requirements for defendants who assert that a third party is responsible for the alleged crime).

1

I

¶80 Mull, Vashawn Smyth,[2] Menjuan Bankhead, and Tyler Harris all attended a party at Ericka Walker's house. A huge brawl erupted after Smyth and another partygoer, Davion Crumble bumped into each other. Walker attempted to intervene and pulled Crumble into a bedroom adjacent to the main living room. Someone then fired through the bedroom door, killing Walker.

¶81 More than twenty-five partygoers gave the police conflicting statements about what happened. They described anywhere between two and eight people standing near the bedroom door at the time of the shooting. And their descriptions of the shooter varied widely. Witnesses described the shooter as wearing a red sweatshirt, a blue sweatshirt, a red and black hoodie, or a white t-shirt with blue jeans. Various eyewitness accounts place Smyth, Bankhead, and Harris in front of the door to the bedroom, two of them armed, with Bankhead shouting "[s]hoot through that motherfucker." The police initially focused their attention on Smyth, who one witness identified as the shooter with "absolute[] certain[ty]." But after Walker's former girlfriend, Cheyenne Pugh, showed police Facebook messages which said that Mull was the shooter, they turned their attention to him. The State eventually charged Mull with first-degree reckless homicide.

---

[2] The record contains numerous alternate spellings for the names of those involved. Both the majority and I use the spellings used at trial for those who testified and the spellings that appear most commonly in the record for those that did not. See majority op., ¶7 n.3.

2

¶82 Given the inconsistent eyewitness accounts and strong evidence pointing to multiple other possible shooters,[3] any reasonable trial counsel should have at least considered mounting a third-party perpetrator defense. See Denny, 120 Wis. 2d at 624 (requiring evidence demonstrating a third party's motive, opportunity, and direct connection to the crime in order to assert such a defense). After all, when it's available, a third-party perpetrator defense is much more compelling than attacking the sufficiency of the State's evidence through a mere reasonable doubt defense. That is because a third-party perpetrator defense seeks affirmatively to disprove the defendant's guilt, and therefore answers the question left open by any reasonable doubt defense: if not the defendant, then who committed the crime? Indeed, research shows that "jurors tend to base decisions on the presentation of a persuasive story, the strength of which is judged in part on the completeness of key story elements."[4] Thus, all else being equal, it's better to point to a third-party who had the motive, opportunity and a direct connection to the crime than simply to poke holes in the State's case.

_____

[3] The majority assumes without deciding that a third-party perpetrator defense can point to "multiple alternative suspects," rather than just one. Majority op., ¶42. I see no reason why Mull or any other defendant asserting a third-party perpetrator defense should be limited to just one alternative suspect if, as here, multiple people are directly connected to the crime and had both the motive and opportunity to commit it. See Denny, 120 Wis. 2d at 624.

[4] David S. Schwartz and Chelsey B. Metcalf, Disfavored Treatment of Third-Party Guilt Evidence, 2016 Wis. L. Rev. 337, 341 (2016).

3

¶83 Yet Mull's attorney mounted a reasonable doubt defense at trial anyway. He did not call any witnesses, and instead relied on cross-examination of the State's witnesses in an attempt to establish reasonable doubt that Mull was the shooter. That effort failed, and Mull was convicted.

¶84 Mull filed a post-conviction motion alleging that his trial counsel was ineffective for failing to assert a third-party perpetrator defense. At the Machner[5] hearing, counsel testified that although he considered it, he did not pursue a third-party perpetrator defense "because it was difficult to locate witnesses who would support that defense." There are good reasons, however, to doubt whether counsel or his investigator made any effort whatsoever to reach key witnesses who would have supported a third-party perpetrator defense. When pressed for specifics, counsel's refrain was that he didn't remember or didn't have his files. For example, counsel couldn't remember whether he tried to locate Keshawna Wright, who identified Smyth——not Mull——as the shooter in a police photo array with "absolute[] certain[ty]." Similarly, counsel couldn't recall any specific efforts he made to locate Jalyn Lynch, who saw Bankhead holding a handgun while trying to get into the bedroom, and heard him yell "shoot, shoot." And despite his suggestion that his investigator might know more, as it turns out, she didn't have a file or notes either. Nor did she remember anything about any witnesses in the case or even if she tried to contact or interview anyone.

---

[5] State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶85 Despite counsel's inability to remember much, if anything, about the efforts made to identify or locate witnesses to support a third-party perpetrator defense, the circuit court nevertheless "found him to be credible as to what he could remember and the things that he said." Thus, the circuit court "accept[ed] his testimony as it was stated at the [Machner] hearing" that he decided to forego a third-party perpetrator defense "in consultation with Mr. Mull and . . . based upon the difficulty in locating and identifying witnesses."[6] Accordingly, the circuit court concluded that counsel's decision to pursue a reasonable doubt defense was an objectively reasonable strategic decision and denied Mull's post-conviction motion.

¶86 In reviewing a claim of ineffective assistance of counsel we must accept the circuit court's findings of fact unless they are clearly erroneous. State v. Pico, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. And as credulous as the circuit court's findings are, I cannot say they are clearly erroneous. Because the circuit court found that counsel tried and failed to locate witnesses to support a third-party

---

[6] Even if we accept trial counsel's assertion that his decision to forego a third-party perpetrator defense was based on the difficulty locating witnesses, it nevertheless appears that counsel might have been able to assert such a defense with respect to Smyth, who testified at trial. In order for that defense to have been compelling, however, counsel would have needed admissible evidence of Wright's statement to the police that she was "absolutely certain" that Smyth was the shooter. But as the circuit court concluded, counsel was unable to locate Wright, and without her appearing at trial, the police report containing her statement identifying Smyth would have been inadmissible.

5

perpetrator defense, counsel's decision to pursue a reasonable doubt defense was objectively reasonable, and his performance in that regard was therefore not deficient. See id., ¶19.

II

¶87 Counsel's decision to pursue a reasonable doubt defense may have been within the bounds of reasonableness, but the same cannot be said of his decisions regarding Mull's alleged hearsay confession.[7] In concluding otherwise, the majority relies on an incomplete picture of the facts and overemphasizes the presumption that counsel's actions were reasonable.

¶88 The majority's analysis gets off on the wrong foot with an attempt to "reconstruct the circumstances of counsel's challenged conduct." Majority op., ¶58. It tries to show that counsel's failure to object to Pugh's testimony about Mull's

---

[7] Mull's postconviction motion alleged that counsel was ineffective because he "fail[ed] to object to impermissible and unreliable hearsay testimony . . . that Mr. Mull was the shooter [and] . . . continu[ed] to elicit hearsay testimony of this nature during his cross-examination . . . without ever moving . . . to have the offending answer stricken."

The circuit court denied that motion without a hearing. Mull appealed and the court of appeals reversed in part, concluding that Mull was entitled to a Machner hearing only on his claims that counsel was ineffective for "failing to move to strike or for a mistrial following hearsay testimony elicited on cross-examination." State v. Mull, No. 2018AP1349-CR, unpublished slip op., ¶1 (Wis. Ct. App. July 23, 2019). The problem with the court of appeals' narrow framing is that the failure to move to strike or for a mistrial is inseparable from the rest of counsel's decisions regarding Mull's alleged hearsay confession. Accordingly, I analyze all of those decisions together.

6

alleged hearsay confession was reasonable because "[t]rial counsel had already objected and been overruled three times during Pugh's testimony." Id., ¶61. The implication is that it would have been futile for counsel to object again when Pugh testified about an alleged hearsay confession by Mull. See id., ¶59. Based on this retelling, the majority concludes that counsel's strategy was objectively reasonable "under the circumstances he faced." Id., ¶62.

¶89 But the "circumstances he faced" demonstrate just the opposite. Read in full, the transcript instead shows that counsel's prior objections were on substantially different grounds to a different line of questioning about a different exhibit that identified a different person as the shooter. At trial, the State called Pugh, who did not attend the party, to testify about Facebook messages she received from a person named Sack Casher, regarding the identity of the shooter. Screenshots of these messages appeared in exhibit 44. Counsel first objected to exhibit 44 based on foundation, but the circuit court did not rule immediately. When later given a chance to elaborate, counsel questioned the screenshot's authenticity and asked for the "http address" of the original message thread. The circuit court then overruled this objection to exhibit 44's foundation, noting that counsel could "cross-examine regarding the source." Bizarrely, counsel's only hearsay objection was to one of the screenshots in exhibit 44 in which Casher said that Smyth——not Mull——was the shooter. That objection was overruled on the grounds that the screenshot was not offered for the truth

7

of the matter asserted but instead to show why the investigation initially focused on Smyth. When exhibit 44 was eventually offered into evidence, counsel reiterated his earlier objection to the foundation and authenticity of the exhibit and was overruled.

¶90 None of these objections related to exhibit 40, the photo of Mull that Kia Wade——not Sack Casher——sent to Pugh. It was in an exchange about that exhibit that Pugh first described an alleged hearsay confession by Mull, stating that "after [Wade] sent me the picture, she told -- she wrote comments that [Mull] was in the hood bragging about [the shooting]." Counsel made no objection to that testimony. In fact, counsel made no objections at all to any of Pugh's testimony about Mull. Given the full context, there is no reason to assume, as the majority does, that it would have been futile for counsel to object to Pugh's testimony about exhibit 40 because he "had already objected and been overruled." Majority op., ¶61.

¶91 To establish deficient performance, a petitioner "must show that 'counsel's representation fell below an objective standard of reasonableness.'" Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)). Once we take into account the important distinction between counsel's objections to exhibit 44 and Pugh's hearsay testimony regarding exhibit 40, counsel's deficiencies become clear. Most obviously, counsel should have objected to Pugh's inflammatory testimony about Mull's alleged hearsay confession. And such an objection, had it been made,

8

should have been sustained. That is because Pugh's statements that Mull bragged about committing the homicide were quintessential hearsay: Pugh was relaying an out-of-court statement by Kia Wade for the truth of the matter asserted, namely that Mull was bragging about killing Walker.[8] See Wis. Stat. § 908.01(3). Counsel then compounded that error by asking Pugh during cross-examination for details about the alleged confession. That led Pugh to reiterate and expand upon the hearsay testimony, stating that "another lady was telling me about [Mull] . . . being in the hood bragging about it saying that he hit a lick over there on 35th and he killed the stud bitch." Finally, rather than move to strike the alleged hearsay confession, counsel appeared to give credence to it by asking the witness what Mull would have meant by the term "stud bitch," which Pugh said was a reference to "a female who dresses like a guy." For these reasons, counsel's actions in this regard did not simply "deviate[] from best practices." Richter, 562 U.S. at 105. Instead, they "amounted to incompetence under 'prevailing professional norms.'" Id. (quoting Strickland, 466 U.S. at 690).

---

[8] The circuit court ruled that the Facebook messages in exhibit 44 pointing to Smyth as the shooter could not be used for their truth but could be used to explain how the police investigation unfolded. Whatever the merits of that ruling, the same exception to the hearsay rule couldn't apply to Mull's alleged confession as "the dangers of prejudice" clearly outweigh its probative value. Jones v. Basinger, 635 F.3d 1030, 1046 (7th Cir. 2011); see also United States v. Benitez-Avila, 570 F.3d 364, 369 (1st Cir. 2009)("A prosecutor cannot justify the receipt of prejudicial, inadmissible evidence simply by calling it 'background' or 'context' evidence.").

9

¶92 In reaching its contrary conclusion, the majority treats the "strong presumption" that counsel's conduct was reasonable as conclusive of the question before us. See majority op., ¶62. But the strong presumption that "the challenged action 'might be considered sound trial strategy'" is not definitive. Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). We must still analyze counsel's actions and decide whether they were, in fact, reasonable. See State v. Hicks, 195 Wis. 2d 620, 629, 536 N.W.2d 487 (Ct. App. 1995), aff'd, 202 Wis. 2d 150, 549 N.W.2d 435 (1996). The majority sets forth a lengthy account of what happened at trial but engages in virtually no analysis of why counsel's actions were not deficient.

¶93 At best, the majority falls back on counsel's supposed strategic reasons for his actions: that he chose to discredit Pugh's testimony through cross-examination and wanted to avoid drawing attention to it by objecting. But these reasons don't excuse his deficient performance either. For starters, defense counsel's goal is always to discredit the State's witnesses. But that cannot mean that an attorney can ignore obvious, highly inflammatory hearsay because his "trial strategy" is to discredit the witness later. In any event, objecting to Pugh's testimony would have furthered, not undermined, his purported strategy of discrediting her. And besides, counsel undermined his own alleged strategic goal of diverting the jury's attention away from these statements when he asked Pugh to elaborate on the alleged confession during cross-examination and to define

10

"stud bitch." Indeed, by doing so, counsel gave credence to the alleged hearsay confession by treating it as if it actually occurred. Accordingly, counsel's purported "strategic decisions" appear to be nothing more than a "post hoc rationalization" for his clearly deficient performance, thus satisfying the first prong of Strickland. See Wiggins, 539 U.S. at 526.

¶94 As for the second prong, I conclude that counsel's deficient performance prejudiced Mull. Confessions are "the most compelling possible evidence of guilt," Miranda v. Arizona, 384 U.S. 436, 466 (1966), and have such a "profound impact on the jury, . . . that we may justifiably doubt its ability to put them out of mind even if told to do so." Arizona v. Fulminante, 499 U.S. 279, 296 (1991). And as explained previously, the admissible evidence of Mull's guilt was far from overwhelming. There were numerous conflicting eyewitness accounts, many of which pointed to other perpetrators. In that context, inflammatory testimony that the defendant was bragging about killing the "stud bitch" could easily have tipped the balance. See Wiggins 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence."); English v. Romanowski, 602 F.3d 714, 730 (6th Cir. 2010) (holding that "the lack of overwhelming evidence of guilt, combined with the negative consequences of defense counsel's [deficient performance], sufficiently creates a reasonable probability that at least one juror would have struck a different balance."). Accordingly, I conclude that counsel's actions with regard to Mull's alleged hearsay

11

confession "undermine confidence in the outcome," and were therefore prejudicial. Strickland, 466 U.S. at 694.

¶95 Because Mull received ineffective assistance when his counsel failed to challenge the admission of an alleged hearsay confession and then elicited further details about it, I respectfully dissent.