COURT OF APPEALS
DECISION
DATED AND FILED

May 8, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1866**

STATE OF WISCONSIN

Cir. Ct. No. 2022TP19

IN COURT OF APPEALS
DISTRICT III

IN RE THE TERMINATION OF PARENTAL RIGHTS TO Z. A.-S.,
A PERSON UNDER THE AGE OF 18:

MARATHON COUNTY,

PETITIONER-RESPONDENT,

V.

S. S.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Marathon County: RICK T. CVEYKUS, Judge. *Affirmed.*

¶1    STARK, P.J.[1]  Sean[2] appeals orders of the circuit court terminating his parental rights to his daughter, Zoey, and denying his motion for postdisposition relief.  Sean argues that he was denied effective assistance of counsel in four respects during the grounds phase of the termination of parental rights (TPR) process and that the individual and cumulative effects of counsel's ineffective assistance warrant a new trial.

¶2    We conclude that Sean's trial counsel did not perform deficiently in the first two respects argued by Sean—i.e., by failing to introduce evidence that Sean contends shows that Marathon County irreparably damaged his relationship with his daughter and by eliciting what Sean asserts was harmful testimony regarding supervision rules imposed due to his conviction for child sex crimes.  We further conclude that Sean has failed to establish that he was prejudiced by his trial counsel's remaining alleged deficiencies.  Accordingly, we affirm the circuit court's orders.

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24).  All references to the Wisconsin Statutes are to the 2023-24 version.

[2]  For ease of reading, we refer to the appellant, the child, and the associated family members in this confidential matter using pseudonyms, rather than their initials.

Cases appealed under WIS. STAT. RULE 809.107 are "given preference and shall be taken in an order that ensures that a decision is issued within 30 days after the filing of the appellant's reply."  RULE 809.107(6)(e).  Conflicts in this court's calendar have resulted in a delay.  It is therefore necessary for this court to sua sponte extend the deadline for a decision in this case.  *See* WIS. STAT. RULE 809.82(2)(a); ***Rhonda R.D. v. Franklin R.D.***, 191 Wis. 2d 680, 694, 530 N.W.2d 34 (Ct. App. 1995).  Accordingly, we extend our deadline to the date this decision is issued.

**BACKGROUND**

¶3    In 2017, Laura gave birth to Zoey.[3]  Laura and Sean were separated and agreed to share equal physical placement of Zoey, and at a point not reflected in the record, Sean was adjudicated Zoey's father.  In December 2018, the County became involved with Zoey due to reports that Laura was involved in prostitution and trafficking drugs.  The County caseworker encouraged Sean on multiple occasions to seek a family court order providing him with additional placement or custody of Zoey, but he failed to follow through with those recommendations.

¶4    In April 2019, Zoey was removed from Laura's care because an individual who was staying with Laura overdosed on illegal substances while that individual was caring for Zoey.  Sean was unable to take custody of Zoey at that time because he was being held on a cash bond in the Oneida County jail after being charged with using a computer to facilitate a child sex crime, attempted second-degree sexual assault of a child, child enticement, and possessing/exposing harmful material to a child.[4]

---

[3] Laura's parental rights are not at issue on this appeal.  We discuss Laura only to the extent necessary to analyze arguments pertaining to Sean's parental rights.

[4] Sean entered a no-contest plea to these charges in 2019.  We take judicial notice of the CCAP records detailing Sean's sentencing for these charges.  *See Kirk v. Credit Acceptance Corp.*, 2013 WI App 32, ¶5 n.1, 346 Wis. 2d 635, 829 N.W.2d 522.  He was placed on a deferred prosecution agreement on the charge of using a computer to facilitate a child sex crime, subject to certain conditions.  On the charges of attempted second-degree sexual assault of a child and child enticement, Sean received concurrent sentences of two years' initial confinement followed by seven and one-half years' extended supervision, which also subjected him to certain conditions.  Sean received a withheld sentence and was ordered to serve nine months' probation on the possessing/exposing harmful material to a child count.  He was released to extended supervision in April 2021.

¶5      In July 2019, Zoey was adjudged to be a child in need of protection or services (CHIPS) due to neglect, pursuant to WIS. STAT. § 48.13(10).  In June 2022, the County filed a petition to terminate both Sean's and Laura's parental rights to Zoey, alleging that Zoey was a child in continuing need of protection or services pursuant to WIS. STAT. § 48.415(2)(a)1 (continuing CHIPS).  In May 2023, the County amended its TPR petition to include the ground of failure to assume parental responsibility under § 48.415(6).  Sean contested the County's TPR petition and demanded a jury trial for the grounds phase of the TPR process.[5]

¶6      Sean filed a motion in limine, requesting, among other things, that the circuit court "determine before trial the existence of any criminal convictions of record against any witness and … consider the admissibility of those convictions prior to trial."  At a pretrial conference, the court ruled that the County could "address the fact that [Sean] was convicted, … what his sentence was, any time [Sean] has been away from the child based upon a prison sentence, … [and] conditions of probation that may make it … more difficult for [Sean] to create a relationship [with Zoey] in the future."  However, the court further ordered that the jury would not be told that Sean was a sex offender and that the County could "not address specifically what the crime was" because the court found that information was not relevant and would be "incredibly prejudicial."

¶7      Prior to the beginning of trial, Sean stipulated that the first element of the ground of continuing CHIPS—that the "child has been adjudged to be … in need

---

[5] A contested proceeding for the termination of parental rights involves a two-step procedure.  *Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶24, 255 Wis. 2d 170, 648 N.W.2d 402.  The first step is a factfinding hearing, in which a jury or circuit court determines "whether any grounds for the termination of parental rights have been" proved.  *Id.*, ¶26; WIS. STAT. § 48.424(3).  The termination proceedings then move to the second step, a dispositional hearing, at which the circuit court must consider the best interest of the child.  WIS. STAT. § 48.426(2).

of protection or services and placed, or continued in a placement, outside his or her home pursuant" to court orders containing a warning of possible grounds for a TPR—had been met. *See* WIS. STAT. § 48.415(2)(a)1. He further waived his right to a jury trial as to that element. After conducting a colloquy, the circuit court accepted Sean's stipulation and waiver. The court also ordered that witnesses be sequestered.

¶8 At trial, the parties presented the testimony of various witnesses, and further facts regarding their testimony are discussed below. Prior to resting its case-in-chief, the County decided not to call Zoey's foster mother to testify, and it released the foster mother from her subpoena. The foster mother, who had previously been sequestered, then sat in the courtroom during the rest of the trial.

¶9 At the close of evidence, the jury found that both grounds existed for the termination of Sean's parental rights. Regarding the continuing CHIPS ground, two of the twelve jurors dissented as to the second element: that the County made reasonable efforts to provide Sean with the services ordered by the court.[6] Following a dispositional hearing, the court concluded that it was in Zoey's best interest to terminate Sean's parental rights and it entered a TPR order.

¶10 Sean filed a motion for postdisposition relief, seeking to vacate the circuit court's TPR order and to obtain a new factfinding hearing. Sean argued that he was denied effective assistance of counsel at the factfinding hearing. After a postdisposition hearing, the circuit court found that Sean had failed to satisfy either prong of the test for ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687. Sean now appeals. Additional facts will be provided below.

---

[6] *See* WIS. STAT. § 805.09(2).

## DISCUSSION

¶11    On appeal, Sean again argues that he was denied effective assistance of counsel during the grounds phase of the TPR proceedings due to several errors by his trial counsel. Specifically, Sean argues that his trial counsel was ineffective in the following manner: (1) failing to introduce evidence that the County "irreparably damaged [his] relationship" with Zoey, (2) eliciting harmful testimony regarding his rules of supervision imposed due to his convictions for child sex crimes, (3) failing to impeach his social worker's testimony regarding both negative and positive observations she made during Zoey's visits with Sean, and (4) "repeatedly" failing to object to "improper evidence." Sean also argues that the cumulative effect of all these deficiencies warrants a new factfinding hearing.

¶12    As a general matter, a parent in a TPR proceeding has a statutory right to the effective assistance of counsel. *Oneida Cnty. DSS v. Nicole W.*, 2007 WI 30, ¶33, 299 Wis. 2d 637, 728 N.W.2d 652. The test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), is the correct standard for evaluating a claim of ineffective assistance of counsel in the context of a TPR proceeding. *Nicole W.*, 299 Wis. 2d 637, ¶33. Under that test, to succeed on his ineffective assistance claims, Sean must show both that his trial counsel's performance was deficient and that the deficient performance prejudiced him. *See id.*

¶13    In analyzing whether counsel's performance was deficient, we compare his or her performance to the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "Only if his [or her] conduct falls outside that objectively reasonable range will we conclude that counsel performed deficiently. 'The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from

6

best practices or most common custom.'" ***State v. Pico***, 2018 WI 66, ¶19, 382 Wis. 2d 273, 914 N.W.2d 95 (citation omitted). We strongly presume that counsel's assistance fell within that range. ***Id.*** Further, "we do not review the reasonableness of trial counsel's decisions with 'the benefit of hindsight.'" ***State v. Mull***, 2023 WI 26, ¶35, 406 Wis. 2d 491, 987 N.W.2d 707.

¶14 To show prejudice, Sean must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See **id.***, ¶37 (citation omitted). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' A lack of confidence arises when 'counsel's errors were so serious as to deprive the [parent] of a fair trial, a trial whose result is reliable.'" *See **Pico***, 382 Wis. 2d 273, ¶20 (citations omitted). We need not address both prongs of the ***Strickland*** test if a parent fails to make a sufficient showing on one of them. *See **id.***

¶15 An ineffective assistance of counsel claim presents a mixed question of law and fact. ***Id.***, ¶13. "We will not reverse the circuit court's findings of fact unless they are clearly erroneous. 'Findings of fact include the circumstances of the case and the counsel's conduct and strategy.' We independently review, as a matter of law, whether those facts demonstrate ineffective assistance of counsel." ***Id.*** (citations omitted).

**I. Trial counsel did not perform deficiently by failing to introduce evidence that the County damaged Sean's relationship with Zoey or by eliciting testimony regarding Sean's rules of supervision.**

¶16 On appeal, Sean first argues that his "[t]rial counsel could and should have presented evidence that the County was responsible for significantly damaging [Zoey's] and [Sean's] relationship by ending in-person visits." In May 2022, the County shortened visits between Zoey and Sean from two and one-half hours to one

hour. In June 2022, the County filed the TPR petition, and on June 28, 2022, the County filed a motion for a temporary injunction prohibiting contact and visitation between Zoey and Sean. The circuit court granted the temporary injunction and prohibited contact between Zoey and Sean, pending a hearing. However, that hearing was not held until November 28, 2022—153 days later. At that hearing, the circuit court denied the injunction, stating that its

> position here is [the court] will not grant such an injunction unless [it] can hear some testimony that shows not only is [Zoey] having a hard time with the visitation, but there's something [Sean] is doing that is inappropriate and causing such behaviors. [The court] heard none of that testimony today.

¶17 Sean's counsel did not make any mention of the temporary injunction or its eventual denial during the jury trial. In his postdisposition motion, Sean noted that he never had another visit with Zoey after the motion for an injunction was filed, and he argued that it was "likely" that had this evidence regarding the County's efforts to prevent reunification been introduced, it would have convinced at least one additional juror that the County did not make reasonable efforts. Sean contended that this omission was particularly important because he claimed that his visits with Zoey were going well prior to the injunction. Sean further argued this evidence was "also relevant to the failure to assume [parental responsibility] ground, as over a year-and-a-half of the lack of in-person visits was based on the County's actions, not [Sean's]."

¶18 At the postdisposition hearing, Sean's trial counsel explained that he did not present evidence regarding the injunction because "the foster mother had a calendar which documented a variety of things, and I didn't want that coming in. And it would have required then attacking her, and that would not have looked good in front of the jury. It would have blown up."

8

¶19 The calendar that trial counsel referenced was a document in which the foster mother kept a record "of any concerning behaviors, any contacts with either parent, and just kind of updates on things about [Zoey]" throughout the entirety of Zoey's placement with her. In creating this record, the foster mother noted that, on the days immediately following Zoey's visitations with Sean, there was a pattern of Zoey having "sleep disturbances" and exhibiting "a lot of negative behaviors" that were unusual for Zoey, including difficulty regulating her own emotions and physical aggression. The foster mother also noted in the calendar that the sleep disturbances and negative behaviors stopped after the temporary injunction was implemented.

¶20 In denying the postdisposition motion, the circuit court agreed with the County that Sean's trial counsel had a "logical" and "strategic" reason for not discussing the injunction during the trial. Specifically, the court found that discussing the injunction

> would have two possible detrimental impacts: One, it could open the door to the reasons behind the request for the termination of visits. And almost more importantly, it could open the door to the information that [the court] had already agreed to it and ordered it.
>
> Hearing that a judge has already made the decision, even if it was temporary, that [contact between] a child and the parent should be terminated could have [had an] insurmountable impact on [Sean's] case.

¶21 On appeal, Sean notes that the circuit court lifted its sequestration order as to the foster mother at the beginning of the third day of trial and allowed her to observe the remainder of the trial. Without citing any authority, Sean contends that because the sequestration order was lifted, the foster mother was no longer available to be called as a witness. Sean argues that, at that point, his trial

counsel's "strategic reason for not addressing the injunction had dissipated" and he was free to establish that the County sought an injunction "without having to worry about [the] foster mom's testimony or cross-examining her."

¶22     We conclude that trial counsel's decision not to present evidence regarding the temporary injunction prohibiting contact between Zoey and Sean was an objectively reasonable trial strategy.  Even if we assume, without deciding, that Sean correctly argues that the foster mother could not testify after her sequestration order was lifted by the circuit court, trial counsel reasonably decided not to present evidence regarding the injunction as the County had another witness it could call in rebuttal to testify regarding the harmful effects of Sean's visits with Zoey.[7] Consequently, we reject Sean's argument that his trial counsel was deficient by failing to use evidence regarding the injunction to show that the County irreparably harmed his relationship with Zoey.

¶23     Specifically, as is shown by a "Notice of Trial Exhibit for a Remote Witness," the County could have called Jacki Streveler, a licensed professional counselor, to testify in rebuttal as to her observations of Zoey during weeks when Zoey had visits with Sean and weeks when they did not have visits.  Streveler's therapy notes, which were filed with the circuit court, contain entries stating that Zoey suffered from "[a]djustment [d]isorder [w]ith mixed disturbance of emotions

---

[7] We note that neither Sean nor the County cite any authority analyzing the competing rights of a foster parent to be heard at a TPR hearing under WIS. STAT. § 48.42(2g) and the right of a person to request that a witness be excluded under WIS. STAT. § 906.15 so that the witness cannot hear the other witnesses' testimony.  However, we need not address this issue, as we conclude that Sean's trial counsel made a reasonable strategic decision not to discuss the injunction regardless of whether the foster mother was able to testify after viewing the remainder of the jury trial.  *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (concluding that we need not address all issues when the resolution of one of the issues is dispositive).

and conduct," as evidenced by "tantrums and other behaviors occurring" following visits with Sean.

¶24 Streveler's therapy notes also recorded specific instances of Zoey's conduct in relation to her visits with Sean. One entry indicated that Zoey had a phone call with Sean during the session and, while Zoey was on the phone, she "was visibly tense, clenching [her] jaw and repeating the same words over and over during the call resembling catatonia. Once the call was done [Zoey] appeared to be calmer but had a more difficult time self[-]regulating than before the phone call occurred." Another entry indicated that the session took place immediately after Zoey had an in-person visit with Sean for the first time in several weeks, and, during that session, Zoey "showed much more dysregulated behaviors than [Streveler] ha[d] ever observed" from her and Zoey did not calm down until the foster mother joined the session.

¶25 This is exactly the type of evidence that Sean's trial counsel sought to avoid bringing to the attention of the jury by not introducing evidence regarding the temporary injunction. It is true that counsel would not have had to "attack" the foster mother on cross-examination if the above evidence were introduced. However, the above evidence would have been detrimental to Sean's defense, as it would have rebutted his claims that he had a substantial relationship with Zoey and that the County interfered with or damaged that relationship. Further, as the circuit court aptly noted, introducing evidence regarding the injunction would have necessarily informed the jury that a court, at some point, felt that it was necessary to prevent contact between Zoey and Sean. Accordingly, we conclude that trial counsel made an objectively reasonable strategic decision not to introduce evidence regarding the injunction at trial, and therefore trial counsel did not perform deficiently in that regard.

11

¶26 Sean also argues on appeal that his trial counsel performed deficiently by eliciting harmful testimony regarding his rules of probation and extended supervision. Specifically, Sean is referring to counsel's cross-examination of Lindsey Flynn, Sean's probation and parole agent, during which counsel elicited testimony that Sean's supervision rules required that his visits with Zoey be chaperoned and that Flynn left the decision of whether to allow unsupervised contact up to his treatment provider.

¶27 Sean asserts that this evidence prejudiced him because the jury could conclude from the elicited testimony that he was a sex offender. He also argues that this evidence permitted the jury to infer that regardless of what services the County provided, he could not move past supervised visits due to his probation rules and thus he could never comply with the CHIPS conditions. Sean also contends that this evidence essentially relieved the County of the need to prove that it made reasonable efforts to facilitate Zoey's reunification with him.

¶28 At the postdisposition hearing, trial counsel testified that he asked Flynn the above questions because Sean asked him to do so. Counsel stated that he did not discuss with Sean the possible consequences of this line of questioning because they "were in the middle of trial" and it was "difficult to do that."

¶29 In response, Sean asked trial counsel if he recalled Sean writing him a note stating, "[T]he jury just heard I would need a chaperone which told them basically what my charges are." Trial counsel responded that he did not specifically remember Sean writing that note, but Sean "may have" done so. Counsel noted that both he and Sean did not want the jury to "glean that [Sean] was a sex offender," but that he pursued that line of questioning because Sean "felt he was getting the run around" from probation officials and Sean was "pushing" him to pursue that

12

line of questioning at trial. Counsel further noted that he and Sean had discussed this issue "a couple times" before trial.

¶30 In denying the postdisposition motion, the circuit court found trial counsel's testimony credible regarding his rationale for pursuing the line of questioning regarding Sean's rules of supervision. The court found that Sean "insisted that these questions be asked," and it rejected the notion that "there was no possible strategic reason" for this line of questioning because Sean "seemed to be convinced that the social worker and his probation agent were working in tandem or were, in connection, plotting against him to deny him his ability to be with his child." Finally, the court rejected Sean's argument that the testimony about his rules of supervision revealed the nature of his underlying charges, as "[t]here are all kinds of reasons this [c]ourt enters no[-]contact provisions in several different cases."

¶31 On appeal, Sean again argues that "[t]rial counsel eliciting testimony regarding [Sean's] rules of supervision was unreasonable and extremely detrimental." He argues that the circuit court's finding that Sean asked his trial counsel to discuss his probation rules was clearly erroneous because the court "failed to consider the note" that he wrote complaining that Flynn's testimony revealed the nature of his criminal charges. Sean further contends that pursuing this line of questioning was unreasonable and that it prejudiced him by causing the jury to infer that he had harmed children before and by absolving the County of the need to "provide reasonable efforts as it related to the continuing CHIPS ground."

¶32 The circuit court's finding—that Sean asked his counsel to discuss his rules of probation—was not clearly erroneous. The circuit court is "the sole arbiter of credibility issues and will be sustained if facts in the record support the court's conclusions," *State v. Sloan*, 2007 WI App 146, ¶21, 303 Wis. 2d 438, 736 N.W.2d

13

189, and the circuit court found Sean's trial counsel to be credible regarding this issue. Further, we agree with the court that trial counsel's questions did not reveal that Sean is a child sex offender and that these questions supported Sean's theory of defense at trial—that the County was working with probation to interfere with, and ultimately deny, Sean's ability to reunify with Zoey.

¶33 The circuit court did not acknowledge Sean's note asserting that trial counsel's questions informed the jury that Sean was a child sex offender. However, this omission does not change our analysis. Sean characterizes his note as "uncontroverted," but he fails to acknowledge that testimony *is* evidence. Sean's trial counsel testified that Sean wanted him to ask Flynn the questions and explained the reasons for doing so. The record supports the circuit court's credibility finding regarding trial counsel's testimony on that point. Accordingly, we conclude that Sean's trial counsel did not perform deficiently by eliciting testimony regarding Sean's rules of supervision.

## II. Sean was not prejudiced by the remaining alleged deficiencies.

¶34 Sean additionally argues that his trial attorney was ineffective by failing to impeach Bailey Champagne, a former family support specialist, regarding both negative and positive observations she made during Zoey's visits with Sean and by failing, in several respects, to object to hearsay evidence or evidence that lacked a proper foundation. Our conclusions as to both of these claims are the same—due to the overwhelming evidence that Sean failed to assume parental rights for Zoey, Sean fails to show that he was prejudiced by either of these alleged errors, individually or cumulatively.

¶35 At trial, Champagne testified that she worked with Sean from approximately summer 2021 until November 2022 and that she supervised his

visitations with Zoey.[8]  Champagne testified that at the end of the visits, Sean would tell Zoey that he loved her and missed her and that Zoey would "repeatedly indicate" that she also loved and missed him, but Champagne also stated that she did not recall if Zoey expressed that she wanted to live with Sean.  Champagne also testified that she did not see Sean demonstrating what he learned in his parenting classes during his visits with Zoey.

¶36     In his postdisposition motion, Sean argued that "[t]rial counsel failed to impeach … Champagne with her notes or use the notes in a way that would have been beneficial to [Sean's] theory of the case."  As an example, he noted that within Champagne's notes was a summary of a visit between Zoey and Sean, in which Champagne noted that, at the end of a visit, Zoey began to cry and stated that she wanted to "go home with daddy [Sean]."  According to Sean, there was no possible strategic reason for failing to introduce evidence that contradicted Champagne's negative testimony by using her notes to cross-examine her, and he asserts that evidence may have changed the jury's mind on whether he assumed parental responsibility.  Sean also argued that his trial counsel "failed to contextualize and correct generalized statements that painted [Sean] in a negative light."

¶37     Sean raises the same arguments on appeal.  He further argues that trial counsel's failure to effectively impeach Champagne prejudiced him by "depriv[ing] the jury of the only statements in the record directly from [Zoey]."  He contends that this evidence was relevant to establishing that he had a substantial parental relationship with Zoey.

---

[8] Champagne initially began testifying remotely via audiovisual means.  Due to poor reception, Champagne had to turn off her video camera and testified solely via audio.  Sean does not raise any arguments regarding Champagne testifying via audiovisual means or solely via audio.

¶38    Regardless of whether trial counsel performed deficiently by failing to effectively impeach Champagne's testimony, we conclude that Sean has failed to prove that he was prejudiced by counsel's performance in this regard. Specifically, we conclude that, in light of the overwhelming uncontested evidence that Sean failed to assume parental responsibility for Zoey, Sean has failed to establish a reasonable probability that the result of the proceeding would have been different but for trial counsel's alleged unprofessional errors. *See* ***Pico***, 382 Wis. 2d 273, ¶20.

¶39    WISCONSIN STAT. § 48.415(6)(a) provides that failure to assume parental responsibility is "established by proving that the parent … ha[s] not had a substantial parental relationship with the child." Section 48.415(6)(b) explains:

> "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

¶40    A number of witnesses, including Sean himself, provided uncontroverted testimony that Sean failed to assume parental responsibility for Zoey. Champagne testified:

> When [we] initially started in[-]person visits [Zoey] was very excited to see [Sean]. She would run up and hug him. She would want to hold his hand walking through the parking lot. But then as visits progressed [Zoey] started kind of clinging more to me. She would want to hold my hands

in the parking lot, but she would not redirect … back to Sean.

Champagne described the bond between Zoey and Sean as being "along the lines of, like, an uncle," because "[w]henever [Zoey] referred to her family it was her foster family, and her brothers and sister were her foster family as well." However, Champagne also noted that "early on" in the visits, Zoey would state, "That's my daddy," in reference to Sean. Champagne again described Zoey and Sean's early bond as being strong, but she noted that this bond weakened over time.

¶41 Sean testified that Zoey had been removed from his care in 2019 while he was incarcerated, and the evidence showed that Sean remained incarcerated until April 2021. Sean then testified about the conditions that he was ordered to meet to have Zoey returned to his care, including that he must not interfere with Zoey's placement, that he cooperate with probation and parole personnel, that he refrain from any activities that would result in his incarceration, and that he complete counseling. Sean explained to the jury that he did not complete counseling because he was reincarcerated in December 2023.

¶42 Doctor Susan Rood, a psychotherapist, testified that she worked with Sean via group therapy for approximately one year. Over that year Sean was unable to demonstrate his ability to take responsibility for his actions. Rood described him as being "very resentful" and "reluctant to participate." Rood opined that Sean "struggles to fully understand the impact and repercussions of his actions, and therefore to fully understand the impact of his behavior, and therefore to take responsibility for it."

¶43 Katie Folwarski, a child welfare support service supervisor, testified that she encouraged Sean to take steps to get additional placement or custody of

Zoey in 2018 due to Laura's drug use, but Sean did not take any of those steps. Craig Sankey, a former ongoing child protective services worker, testified that while Sean was unable to attend medical or dental appointments for Zoey due to his incarcerated status, there was nothing preventing Sean from contacting those providers on his own. Kristine Halverson, a supervised visitation worker, testified that she facilitated phone calls between Zoey and Sean. She described those phone calls as being "disruptive" because "[Zoey] didn't want to talk to him on the phone." Abbigayle Quaintance, a family support specialist, testified that Sean consistently attended phone visits at first, but his attendance became inconsistent over time.

¶44 The above evidence overwhelmingly shows that Sean did not have a substantial parental relationship with Zoey. Sean's trial counsel's failure to impeach Champagne regarding the negative and positive observations she made during a few visits between Zoey and Sean does not undermine our confidence in the outcome of the trial. *See Pico*, 382 Wis. 2d 273, ¶20.

¶45 Sean additionally argues that he was prejudiced by his trial counsel's failure to object to hearsay evidence and evidence that was admitted without a proper foundation. Specifically, Flynn testified that Sean was one of her clients, but was removed from her caseload in approximately December 2023 due to him reportedly cutting off his GPS monitor and subsequently making threats against her. Flynn also testified that prior to Sean making those threats, he was taken into custody in December 2023 for "stalking and harassing behaviors of other clientele on supervision along with his ex-girlfriend." Flynn then continued to discuss Sean's probation violations.

¶46 Further, Shannon Drews, a former ongoing social worker, testified that she was involved in permanency planning for Zoey and discussed Sean's visits

18

with Zoey. According to Sean, however, Drews' testimony was unclear as to whether she directly observed the visits or was merely summarizing information from Champagne and Streveler.

¶47 In his postdisposition motion, Sean argued that Flynn's testimony regarding the alleged probation violations "was almost entirely hearsay or without proper foundation." He noted that his trial counsel initially objected on the basis of foundation and hearsay to Flynn's testimony regarding GPS monitoring, but he explained that counsel subsequently withdrew the objection because it was a "regularly conducted business activity." Sean contended that trial counsel should have objected to Flynn's testimony regarding the GPS monitor, Sean's history of stalking and harassment, and Sean's threats regarding Flynn. He argued that Flynn's testimony prejudiced him on both alleged TPR grounds. Similarly, Sean argued in his postdisposition motion that Drews "testified about visits she was not part of and to the alleged probation violations—all of which was hearsay and at times without foundation." Sean noted that his trial counsel did not raise any hearsay or foundational objections to Drews' testimony.

¶48 In its oral ruling on the postdisposition motion, the circuit court noted that Sean's hearsay argument was "possibly the strongest argument" he raised in his motion. However, the court found that the hearsay "did not have any real prejudice to [Sean] and that none of these alleged deficiencies, including the hearsay objections, would have changed the outcome of the trial" because the uncontested evidence "showed that [Sean] did not provide [Zoey] with shelter, was not ensuring she received medical care, did not help with school work, did not help to deliver her to school, did not engage in school activities, did not engage in day-to-day supervision, education, or protection and care of [Zoey]."

¶49     On appeal, Sean again argues that Flynn's testimony regarding his probation violations was inadmissible hearsay, that his trial counsel's hearsay objections were not overruled because counsel withdrew one and the court did not rule on the other, and that Flynn's testimony prejudiced him as to both alleged TPR grounds. Sean also argues that Drews' testimony, regarding his visits with Zoey and his later threat to take Zoey from her placement, was inadmissible hearsay and prejudicial as to both alleged TPR grounds.

¶50     We again conclude that in light of the overwhelming uncontested evidence, Sean has failed to establish a reasonable probability that the result of the proceeding would have been different but for trial counsel's alleged unprofessional errors. *See Pico*, 382 Wis. 2d 273, ¶20. In addition to the above evidence from Champagne, Sean, Flynn, Dr. Rood, Folwarski, Sankey, Halverson, and Quaintance, *see supra* ¶¶40-43, we find the following evidence to be particularly pertinent to the lack of prejudice to Sean regardless of counsel's failure to object on hearsay and foundation grounds.

¶51     At trial, Sean explained that he was reincarcerated due to a "mental breakdown issue" that caused him to "blackout." Sean said that he did not recall what happened when he blacked out, but he knew that the allegations against him were "[f]leeing and eluding, and possession of a knife." Sean testified that he did not recall removing his GPS monitor and did not recall making any violent threats toward Flynn. Sean did however, agree that removing his GPS monitor and threatening his probation agent would be in violation of his probation conditions. Further, Sean acknowledged that his probation was subsequently revoked for violation of his conditions of supervision.

20

¶52    Dr. Rood noted that Sean never reported having blackouts. Rood stated that she was familiar with blackouts caused by post-traumatic stress disorder (PTSD) and opined, "As far as individuals blacking out and remaining conscious as a condition of [PTSD], that is very, very unusual. Those types of blackouts are associated with a different condition."

¶53    Finally, Drews testified that Sean had never "been able to show the ability to maintain a safe and suitable residence" for Zoey "long term." Drews also stated that Sean had demonstrated the ability to manage a household for only "a short period" and that he was currently unable to do that. Drews stated that the last time Sean contacted Zoey was prior to his incarceration and that he had not written letters to Zoey since his incarceration, despite offering Sean envelopes so that he could send letters.

¶54    In light of the above uncontested and overwhelming evidence that Sean failed to assume parental responsibility, we are not persuaded that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Pico*, 382 Wis. 2d 273, ¶20 (citation omitted). The evidence at trial showed that Sean failed to assume parental responsibility for Zoey due to his lack of consistency; the diminishment of their relationship over time, in conjunction with Sean's continued criminal activity; Sean's failure to progress with the programming provided to him; and his failure to accept responsibility for his criminal actions.

¶55    We also reject Sean's cumulative prejudice argument. We have already concluded that Sean's trial counsel did not perform deficiently in two respects and that Sean was not prejudiced by counsel's other claimed deficiencies. On the record before us, there is no basis to conclude that the cumulative effect of

Sean's ineffective assistance claims warrants a new trial. Zero plus zero equals zero. *See **Mentek v. State***, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976).

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.