COURT OF APPEALS
DECISION
DATED AND FILED

May 27, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP444-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF873

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JACQUELINE CARLA DAVIS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: MARK G. SCHROEDER, Judge. *Judgment reversed; order affirmed in part, reversed in part and cause remanded for further proceedings.*

Before Stark, P.J., Hruz, and Blanchard, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.  Jacqueline Davis appeals a judgment convicting her, following a jury trial, of one count of attempting to receive compensation for human trafficking and two counts of felony bail jumping.  She also appeals an order denying her postconviction motion for a new trial.  Davis argues that the circuit court erred by determining that information in the State's possession about an anonymous tip given to the police, including the identity of the anonymous reporter,[1] was privileged pursuant to WIS. STAT. § 905.10 (2023-24)[2] and by concluding that the State did not violate its discovery obligations under WIS. STAT. § 971.23(1) when it failed to disclose nonprivileged information regarding the anonymous tip.  Davis also argues that her trial counsel was constitutionally ineffective by failing to object to the State introducing evidence about the anonymous tip and by failing to object to portions of Davis's interview with law enforcement that were played for the jury.

¶2      We conclude that the circuit court did not err by determining that the information about the anonymous tip was privileged and that the State did not violate its discovery obligations.  We affirm that portion of the court's postconviction order.  We do, however, agree with Davis that her trial counsel was constitutionally ineffective in several respects.  Accordingly, we reverse the judgment of conviction and the portion of the order denying Davis postconviction

---

[1] We use the term "anonymous" throughout this opinion because that modifier is what both the parties and the circuit court used throughout the case to describe the tip that led to law enforcement's investigation into Davis.  It is entirely unclear to this court, from the record, what identifying information law enforcement had in relation to the individual who provided the anonymous tip other than that the individual was female and belonged to a group of people that would tend to lend credence to the tip at issue in this case.

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

2

relief on the ground of ineffective assistance of counsel, and we remand the case for further proceedings consistent with this decision.

## BACKGROUND

¶3 According to the criminal complaint, Appleton Police Lieutenant Adam Nagel received an anonymous tip that Davis and a person we identify as Henry "were attempting to recruit women [into] prostitution in the Fox Valley area."[3] The anonymous reporter provided Davis's phone number and informed Nagel that Davis "was attempting to recruit homeless women and women that ha[d] previously been involved in prostitution." Based on the information from the anonymous tip, Nagel sent a text message to Davis using the undercover identity "Holli." Davis responded to "Holli," creating a long text message exchange, which we discuss in detail below.

¶4 As background, it is sufficient to note that Holli texted Davis that Holli needed to make money and that she could not send Davis a picture of herself because her phone's camera did not work. Davis asked whether Holli had "ever done anything like this" before and whether Holli would agree to "a 40/60 split." Davis further texted Holli that she needed "to take pictures of [Holli] and post an ad[]" and that Davis would provide Holli with condoms. After describing the "job" to Holli and texting that it was "good money," Davis agreed to pick up Holli in Appleton.

---

[3] We use a pseudonym to identify this person because his identity is not significant to any issue on appeal, and he has not had an opportunity to defend his reputation through the legal process.

¶5 At the agreed on time and place in Appleton, law enforcement was waiting. Davis and her passenger, Henry, were arrested. At the time of her arrest, Davis was on bond on two other criminal cases. When interviewed by Lieutenant Nagel, Davis said that she "never intended to actually pick up any women, but that she wanted to manipulate them into taking pornographic photographs" that she would then sell to customers through a website.

¶6 After the case was charged, and after the State failed to respond to Davis's discovery demand for information regarding the tip, Davis moved to compel the State to disclose the identity of the anonymous reporter and any records associated with the anonymous tip. Davis asserted that the State had not disclosed any materials regarding the reporter's identity, "the date and time of the call, how the call was placed, the extent of the information provided, nor any actions on the part of law enforcement to independently corroborate the reporter's information." Davis pointed out that Henry had been in the vehicle with Davis when she was arrested and, based on this fact, argued that if the tip was related to "either of their backgrounds, that could very well have an impact on the defense or the theory of defense on how we pursue that defense."

¶7 In response to Davis's motion, the State asserted its privilege not to disclose the identity of the anonymous reporter pursuant to WIS. STAT. § 905.10(1), and it argued that Davis had not met any of the statutory exceptions to that privilege. The State acknowledged that § 905.10(1) did not apply to information about the broader circumstances surrounding the anonymous tip but, rather, applied only to the person's identity. It asserted, however, that disclosing information concerning the nature and circumstances surrounding the tip could reveal the identity of the reporter.

¶8      The circuit court determined that Davis had met her burden of raising a reasonable possibility that the information would be necessary for a fair determination of her guilt or innocence, and it ordered the State to provide the court with the identity of the anonymous reporter and records relating to the anonymous tip for an in camera review. The State disclosed, only to the court, what the court described as "a single piece of paper that provides some information about the source of the information but not the identity of that person," which contained "a total of three sentences." The court again ordered the State to disclose to the court the name and date of birth of the anonymous reporter for the court to conduct an in camera review of all the information and to determine whether the information was necessary for Davis's defense.[4]

¶9      The State then disclosed the same information to the circuit court as before but now with an attached affidavit from Lieutenant Nagel. Nagel averred that he had received specialized training in human trafficking investigations, that he had participated in the investigation of Davis's attempted human trafficking offense, and that he was responding to the request for more information regarding the anonymous tip at issue here.

¶10     The State also filed with the circuit court, and provided to the defense, a separate memorandum in support of its position that WIS. STAT. § 905.10 did not give the court the authority to compel the State to provide the name and date of birth of the anonymous reporter. The State also sought written findings and conclusions from the court because it planned to file a petition for

---

[4] Although the circuit court ordered the State to disclose to the court the reporter's name and date of birth, the record does not reveal whether the State was aware of the reporter's name and date of birth.

leave to appeal what the State characterized as the court's rulings regarding its decision to conduct an in camera review, including its determination that Davis had met her initial burden for an in camera review.

¶11 The circuit court interpreted the State's memorandum as a motion for reconsideration of its order to disclose the name and date of birth of the anonymous reporter. The court ultimately concluded that its order was based on a manifest error of law because it had "overreached" by ordering the disclosure of that information. On this ground, the court granted the State's motion for reconsideration and determined that the State had met its obligation to disclose sufficient information for the court's in camera review. Based on the State's disclosure, the court concluded that the additional information sought by the defense was not necessary for the fair determination of Davis's guilt or innocence and that it would not be disclosed to Davis.

¶12 Following the circuit court's ruling on the motion to compel, Davis's counsel withdrew, and she was appointed new counsel. The case proceeded to a one-day jury trial, at which the State's only witnesses were Lieutenant Nagel and a police captain who testified about Davis's arrest. Regarding the two bail jumping charges, Davis stipulated that at the time of her arrest she was charged with a felony offense, that she had been released from custody on a bond, and that a condition of her bond included not committing additional offenses. The trial thus focused on whether Davis attempted to receive compensation for human trafficking.

¶13 Lieutenant Nagel testified about his professional experience and specialized training related to human trafficking crimes. He also testified that he first contacted Davis after receiving "anonymous information that Ms. Davis was

involved in recruiting young homeless women into prostitution." Nagel described how he contacted Davis as "Holli." Nagel then went through his text message exchange with Davis, which was admitted into evidence, and he testified about how he interpreted the meaning of those messages in the human trafficking context, which included references to his training and professional experience.

¶14 The text messages show that "Holli" contacted Davis, telling Davis that Holli wanted to make money and that Holli could not send Davis a photo because her phone's camera did not work. Davis asked Holli what hours she could work, whether Holli had done "anything like this" before, whether Holli had ever given "massages or sex," and whether Holli had "ever made a man cum in 5 minutes and get paid." Davis texted that she "set everything up," and Davis further asked whether Holli agreed to a "40/60 split." Davis also texted that if Holli were to "work out and follow through we will be in a hotel room," and she asked Holli, "What is off limits to you?" (Formatting altered.)

¶15 Davis further texted Holli that Davis had to take pictures of Holli to use in a posted advertisement. In response to Holli's concern with having unprotected sex, Davis texted, "You use protection[.] I will provide condoms." When Holli asked whether she had to have sex with one or multiple people, Davis responded, "It's more like a job[.] [I]t's going to be several times and [some things] may just be a simple massage and maybe oral it [may be] just conversation it all depends and the weirder it is unfortunately the more money you make." Holli also asked how much money she could make, and Davis responded, "It varies … if I work smart and hard I can make 1000 a day." Davis and Holli then discussed Davis picking up Holli in Appleton and Holli paying for gas.

7

¶16  Lieutenant Nagel also testified that he interviewed Davis after her arrest and that the interview was recorded. Prior to playing a recording of the interview for the jury, the parties discussed the portions of the interview that the prosecution would play, and they agreed on the time stamps for starting and stopping the video. The record shows, however, that the State started and stopped playing the interview at different times than what the parties had agreed.

¶17  The portions of the interview that were played for the jury included the following. Davis told Nagel that she was living out of state, but that "legal stuff brought [her] back" to Wisconsin. She expressed the belief that Nagel was interviewing her because of her agreement to pick up Holli. When Nagel asked her to further explain, Davis said that she had been "lying to a few women and getting their photos and then selling their photos online," implying that this is what she had planned to do with Holli. Davis said that her practice was to make an online post for interested parties and, rather than meet with whoever responded as an interested party, she would tell the person that she was selling explicit photos for $20 to $30.

¶18  Davis told Nagel that she would get photos to sell in this way from women by "flirting with [them] a little bit" or else she would sell "fake pictures" of women that she found online. Davis also said that the women who she scams "think that I'm taking them on dates and I'm not. I'm taking their photos" and "using them to get money." Davis said that she had made money in this manner between five and six times and that she had received photos from two women. She further said that she had never met up with a woman to take photos, but she explained that is what she had intended to do with Holli.

¶19     During the interview, Lieutenant Nagel said that he did not believe that Davis was going to pick up Holli and simply take pictures of her, but rather that he believed that Davis wanted to use Holli to make money for Davis by trafficking Holli "cooperatively" and without "forc[ing] her to do anything" and that Davis "would be transport for her."  Davis responded that Nagel's belief was "not necessarily true."  Before she was interrupted by Nagel, she added the unclear statement that she "probably wouldn't turn her down if she wanted to, but I didn't, … really—."  Nagel directed Davis's attention to the text messages in which she stated that she was, in Nagel's words, "essentially teach[ing] [Holli] how to make money," that "talked about [Holli] having sex with people," and that talked about Holli "making a thousand bucks a day."  Davis acknowledged that she sent those messages, but she said that they were all "bullshit."

¶20     Lieutenant Nagel then said that he had worked with a victim who had been "assaulted about 18 times in one day.  It was during a sporting event time, and the pimp that was abusing her was a horrific human being."  Nagel also said that Davis's name "came up" in his investigation of Davis's case and that she had been "trying to recruit girls," which Davis denied doing.  In response to this denial, Nagel said, "I don't get information like that from three different agencies without there being some truth to it," suggesting that three agencies had incriminating information regarding Davis.

¶21    The jury found Davis guilty on all three counts. The circuit court subsequently imposed sentences totaling two years and six months of initial confinement followed by two years and six months of extended supervision.[5]

¶22    Davis moved for postconviction relief, seeking a new trial on three bases: (1) the circuit court erroneously exercised its discretion by denying Davis's motion to compel the State to disclose the anonymous reporter's identity and information surrounding the anonymous tip; (2) the State violated its discovery obligations by failing to disclose nonprivileged information surrounding the anonymous tip; and (3) Davis's trial counsel was constitutionally ineffective by failing to object to the State's reference to the anonymous tip in its opening statement and in Lieutenant Nagel's testimony and by failing to object to portions of Davis's interview in which Davis said she was in Wisconsin due to "legal stuff," to Nagel's discussion of a human trafficking victim in another case, and to Nagel's reference to purported information from three different agencies, suggesting that the agencies had incriminating information about Davis.

¶23    Following a *Machner*[6] hearing, at which Davis's trial counsel testified, the circuit court denied Davis's postconviction motion for a new trial. As to Davis's ineffective assistance of counsel claim, the court concluded that Davis's trial counsel was deficient by failing to object to the portions of the interview in which Nagel discussed the human trafficking victim in another case and the purported information from three other agencies. It further concluded that

---

[5] The circuit court also ordered Davis to register as a sex offender for the rest of her life. The court subsequently amended the registration requirement to 15 years, following Davis's request for that relief in her postconviction motion.

[6] *See* *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

10

counsel had overall been deficient in her preparation and response to the differences in time stamps and for failing to request additional time to review the recorded interview "to make certain that she was clear on what was going to be played and what was not."

¶24    But the circuit court concluded that Davis's trial counsel's deficiencies did not prejudice Davis's defense.  Davis now appeals, raising the same arguments she made in her postconviction motion.  Additional facts will be provided below as necessary.

## DISCUSSION

### I. The Anonymous Tip

¶25    Davis argues that the circuit court made two errors in agreeing to allow the State to limit its disclosure to Davis of information surrounding the anonymous tip.  First, Davis argues that the court failed to require the State to provide the information necessary for the court to conduct its in camera review.  Second, Davis contends that the court erroneously determined the information was not necessary once it was established that Henry was not the anonymous reporter.

¶26    WISCONSIN STAT. § 905.10(1) recognizes the State's privilege "to refuse to disclose the identity of a person who has furnished information relating to or assisting in an investigation of a possible violation of law to a law enforcement officer."  The privilege is not absolute.  *State v. Nellessen*, 2014 WI 84, ¶15, 360 Wis. 2d 493, 849 N.W.2d 654.  "[T]he State's interest in encouraging citizens to communicate their knowledge of the commission of crimes to law enforcement officials by preserving their anonymity must be balanced against the defendant's right to prepare his or her defense."  *Id.*

11

¶27 Here, Davis sought an order requiring disclosure under WIS. STAT. § 905.10(3)(b), one of the three statutory exceptions to the privilege set forth in § 905.10(3). Pursuant to that exception, the defendant must first show that "an informer may be able to give testimony necessary to a fair determination of the issue of guilt or innocence." Sec. 905.10(3)(b); *Nellessen*, 360 Wis. 2d 493, ¶22. This initial showing is not a significant burden, requiring the defendant to "only show that there is a reasonable possibility that a confidential informer may have information necessary to his or her theory of defense." *Nellessen*, 360 Wis. 2d 493, ¶¶19, 25.

¶28 Once the defendant makes that initial showing, the State has "an opportunity to show [the circuit court] in camera facts relevant to determining whether the informer can, in fact, supply that testimony." WIS. STAT. § 905.10(3)(b). The State will ordinarily make this showing through affidavits, but the circuit court "may direct that testimony be taken" if it determines "that the matter cannot be resolved satisfactorily upon affidavit." *Id.* If the court determines that there is "a reasonable probability" that the informer can provide testimony necessary to a fair determination of the issue of guilt or innocence, the privilege must give way. *Id.*; *State v. Vanmanivong*, 2003 WI 41, ¶32, 261 Wis. 2d 202, 661 N.W.2d 76. "Necessary" means that the testimony "could create a reasonable doubt of the defendant's guilt in jurors' minds." *Vanmanivong*, 261 Wis. 2d 202, ¶32. If the State chooses not to disclose the informer's identity despite the court making the requisite finding, the court, on the defendant's motion, "shall dismiss the charges to which the testimony would relate." Sec. 905.10(3)(b).

¶29 Here, the parties do not dispute that Davis made an initial showing that there was a reasonable possibility that theoretical testimony from the

anonymous reporter and records related to the tip were necessary to a fair determination of Davis's guilt or innocence. The circuit court agreed with Davis that the anonymous tip could have been related to someone from either Henry's or Davis's past, given that Henry was arrested with Davis. The court observed that, as far as the record to that point revealed, Henry and not Davis might have been the person texting back and forth with Lieutenant Nagel's "Holli," and, if that were true, "that could be the product of a couple of different set of factual circumstances," including that Henry was attempting to frame Davis. If that was Davis's theory of defense, the court concluded that the identity of the anonymous reporter may be necessary for the fair determination of Davis's guilt or innocence.

¶30     The dispute here lies in the circuit court's decision following its in camera review of the State's disclosure, which we review for an erroneous exercise of discretion. *See **Vanmanivong***, 261 Wis. 2d 202, ¶15. We uphold the court's exercise of discretion if it considered the facts and reasonable inferences from the record and reached a conclusion "based on a logical rationale founded upon proper legal standards." ***Id.*** (citation omitted).

¶31     Davis points out that the circuit court's description of the State's disclosure did not reveal the anonymous reporter's identity; what his or her testimony would be; or "the what, where, when, or similar facts surrounding the tip." For these reasons, Davis contends, the court's failure to demand that the State produce more relevant information resulted in the court misapplying the law, because it could not properly determine whether the provided information was essential to a fair determination of Davis's guilt or innocence. Davis further argues that the court also erred by concluding that additional information was not necessary for a fair determination of Davis's guilt or innocence based only on the State's showing that Henry was not the anonymous reporter.

13

¶32 We conclude that the circuit court did not erroneously exercise its discretion by determining that the State's disclosure was not necessary for a fair determination of Davis's guilt or innocence. The State initially disclosed in camera a document that the court characterized as not "actually identify[ing] anybody directly" and instead it described the anonymous reporter as falling "into a sort of category of people." Because this disclosure did not identify the anonymous reporter, which the court had expected, the court questioned why it should not order the State to disclose to Davis the information that it possessed. The State took the position that its disclosure excluded Henry as the anonymous reporter and further argued that "any other additional details that the Court might be interested in or that [Davis] might be interested in would be irrelevant at this point." The State also acknowledged that its in camera disclosure did not identify the anonymous reporter, but it argued that the disclosure remained privileged under WIS. STAT. § 905.10(1) because the disclosure could reveal the reporter's identity.

¶33 Following the circuit court's order for disclosure of the anonymous reporter's name and date of birth, the State argued that requiring it to disclose that specific information would "undermine[] the credibility of officers that receive tips under condition of anonymity" to the defense and the public "and jeopardize[] a useful investigative tool used by law enforcement to protect the community." At the hearing on the State's motion for reconsideration, the State again argued that the disclosures it made to the court were sufficient for the court to conclude that Henry was not the anonymous reporter and that the State was not required to disclose any additional information. The court agreed with the State and concluded that its order to disclose the anonymous reporter's name and date of birth was a manifest error of law. It further concluded that the State fulfilled its

obligations under the original disclosure order and that, based on the information the State provided, the information was not necessary for a fair determination of Davis's guilt or innocence.

¶34 Although the State's in camera disclosure did not identify the anonymous reporter, our review of it supports the circuit court's conclusion that the State provided sufficient information to determine whether there was a reasonable probability that the information was necessary for a determination of Davis's guilt or innocence. The information provided about the anonymous reporter in the disclosure was not necessary to support Davis's defense that she intended only to get photos of Holli to sell online and not to engage in sex trafficking. As the court found, the reporter was not Henry. Nor was it a person who Davis had manipulated into giving her photos in the past, as Davis argues as one possibility on appeal.

¶35 Thus, the circuit court did not need more information from the State to consider and determine whether there was a reasonable probability the information the State provided could create a reasonable doubt as to Davis's guilt in jurors' minds. And the court properly concluded there was no such probability. Therefore, the court did not erroneously exercise its discretion by concluding the information would not be disclosed to Davis.

## II. The State's Discovery Obligations

¶36 Davis argues that the State violated its discovery obligations pursuant to WIS. STAT. § 971.23(1) by failing to disclose "all information in its possession about the circumstances surrounding [Lieutenant] Nagel's receipt of the information from the anonymous tipster," including when he received the information, whether he questioned the information, and the content of the tip.

15

Davis contends that all the information about Nagel's receipt of the anonymous tip cannot be covered by the State's WIS. STAT. § 905.10(1) privilege. She further asserts that by introducing information at trial that Nagel received an anonymous tip, the State was obligated to disclose any nonprivileged information related to the tip, even if that information was not presented at trial.

¶37    Whether the State violated its discovery obligations involves the interpretation and application of a statute to a set of facts, which is a question of law that we review independently. *State v. Ronell Harris*, 2008 WI 15, ¶15, 307 Wis. 2d 555, 745 N.W.2d 397. When we review an alleged discovery violation, we first determine "whether the State failed to disclose information it was required to disclose under WIS. STAT. § 971.23(1)." *State v. Rice*, 2008 WI App 10, ¶14, 307 Wis. 2d 335, 743 N.W.2d 517 (2007). If the State failed to disclose the information, we next determine whether the State had good cause for its failure to disclose. *Id.* If there is no good cause, we determine whether admission of the evidence was harmless. *Id.*

¶38    The State's discovery obligations include disclosing to the defendant "[a]ny relevant written or recorded statements of a witness … that the [State] intends to offer in evidence at trial." WIS. STAT. § 971.23(1)(e). "[A] defendant is not entitled to evidence beyond which the prosecutor is constitutionally or statutorily required to disclose." *State v. Kevin Harris*, 2004 WI 64, ¶16, 272 Wis. 2d 80, 680 N.W.2d 737. Here, the record shows that the State disclosed Lieutenant Nagel's police report to Davis and the fact that Nagel was investigating an anonymous tip that Davis was attempting to recruit women into prostitution in the Fox Valley. As noted above, the State did not disclose the anonymous reporter's identity or any additional information surrounding the tip because it was privileged under WIS. STAT. § 905.10(1).

16

¶39 As it did in the circuit court, the State on appeal notes that any additional information surrounding the tip undermined the anonymity of the person giving the tip. Thus, the State disclosed the nonprivileged information regarding the anonymous tip to which Davis was entitled under WIS. STAT. § 971.23(1), and it was not required to disclose additional information that was privileged under WIS. STAT. § 905.10(1). Because the State disclosed all the information it was required to regarding the anonymous tip, the State did not violate its discovery obligations.

### III. Ineffective Assistance of Counsel

¶40 Davis argues that her trial counsel was constitutionally ineffective by failing to move to exclude or object to information about the anonymous tip at trial and by failing to object to portions of Davis's interview with law enforcement played for the jury. An ineffective assistance of counsel claim requires a defendant to show both that his or her trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *State v. Domke*, 2011 WI 95, ¶33, 337 Wis. 2d 268, 805 N.W.2d 364. Whether the defendant received ineffective assistance of counsel is a mixed question of law and fact. *Id.* We uphold the circuit court's findings of fact, which include "the circumstances of the case and the counsel's conduct and strategy," unless they are clearly erroneous. *Id.* (citation omitted). Whether counsel's performance constitutes ineffective assistance is a question of law that we review de novo. *Id.*

¶41 Trial counsel's performance is deficient when his or her representation falls below an objective standard of reasonableness considering all of the circumstances. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). We strongly presume that "counsel's conduct falls within the wide range of reasonable

17

professional assistance," *id.* at 689, and we are highly deferential to counsel's strategic decisions as long as they are objectively reasonable, *State v. Mull*, 2023 WI 26, ¶35, 406 Wis. 2d 491, 987 N.W.2d 707.

¶42 Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* The defendant "need not prove the outcome would 'more likely than not' be different in order to establish prejudice." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). Rather, the defendant must show that "but for his [or her] lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." *Id.*, ¶45. "If there is no reasonable probability that the jury would have reached a different verdict," the defendant has not shown prejudice. *Id.*, ¶46.

¶43 Further, when determining whether counsel's deficient performance prejudiced the defense, "we may aggregate the effects of multiple incidents of deficient performance." *State v. Thiel*, 2003 WI 111, ¶60, 264 Wis. 2d 571, 665 N.W.2d 305. Whether counsel's aggregate errors constitute prejudice depends upon the totality of the circumstances at trial. *Id.*, ¶62.

*A. The State's Reference to the Anonymous Tip at Trial*

¶44 Davis argues that her trial counsel was deficient by failing to object to the State referring to the anonymous tip at trial, particularly in the manner in which it made the reference. In its opening statement, the State commented that Lieutenant Nagel "received a tip, an anonymous tip, that Jacqueline Davis was recruiting young homeless women to the practice of prostitution." The State

observed that, standing alone, the anonymous tip that Nagel received was insufficient "for criminal charging" and was "not strong evidence," which called for Nagel to pursue an investigation. As noted above, Nagel testified that he received "anonymous information" regarding Davis, and on cross-examination, Nagel confirmed that he had received the anonymous tip through a phone call and that the tip also named Henry.

¶45 At the *Machner* hearing, Davis's trial counsel testified that she could not recall why she did not object to the State's opening statement or how the anonymous tip was brought up in that instance, but she testified that "it usually takes a lot for [her] to object during an opening statement." As to Lieutenant Nagel's testimony, counsel testified that she did not recall "the specifics of how that would have come up" and that she "might have miscalculated." Although counsel knew about the circuit court's ruling on the motion to compel, counsel did not know "what was to be admitted regarding the anonymous tip."

¶46 The circuit court concluded that the decision by Davis's trial counsel not to object to the State's opening statement was reasonable under the circumstances because the way that the State had referenced the anonymous tip was "fairly innocuous" and not objectionable. The court did not address Lieutenant Nagel's testimony regarding the anonymous tip.

¶47 Davis argues that her trial counsel was deficient because there were multiple grounds on which to object to the State's references to the anonymous tip. Davis asserts that the references to the anonymous tip violated her right to confrontation and the court's order granting counsel's motion in limine excluding other-acts evidence. Davis further asserts that the reference to the tip was also hearsay evidence and further inadmissible because its probative value was

19

substantially outweighed by its prejudicial effect. *See* WIS. STAT. §§ 904.03, 908.01(3).

¶48 We conclude that Davis's trial counsel's decision not to object to the State referencing the anonymous tip was deficient. Although we agree with the State that the evidence of the tip was offered to explain the basis for Lieutenant Nagel's investigation, *see State v. Hines*, 173 Wis. 2d 850, 859, 496 N.W.2d 720 (Ct. App. 1993), counsel still could have prevented the State from mentioning the fact that the investigation was based on a tip, which inherently lent credibility to the charges. Counsel could have done so by (1) filing a motion in limine to exclude the fact of the tip and find a less incriminating manner to explain how Nagel's investigation began, without discussing the tip, or (2) seeking a cautionary instruction for the jury to consider that evidence only as context for the basis of the investigation and not for the truth of the matter asserted in the tip.

¶49 The primary deficiency, therefore, is that Davis's trial counsel failed to reasonably prepare for handling the use of unnecessary references to the anonymous tip, which immediately exposed the jury to not only the highly incriminating proposition that Davis had been recruiting young women into prostitution when the investigation of her began, but also that another person claimed to have knowledge she was engaging in that activity. Counsel failed to do anything to prevent the reference to the anonymous tip, and she did not provide a reasonable strategic reason for failing to do so. Rather, counsel admitted that she did not know what was to be admitted in relation to the anonymous tip, even though she was aware of the circuit court's ruling on Davis's prior motion to compel discovery. And counsel's brief cross-examination of Lieutenant Nagel on the issue was ineffectual, insomuch as she could not question Nagel about the anonymous reporter's identity or the circumstances surrounding the tip. She

20

simply reconfirmed that the tip was "anonymous" and elicited the fact that the tip also named Henry. Counsel admitted that she "might have miscalculated" regarding how to handle Nagel's testimony regarding the tip.

¶50 Our analysis is further informed by the fact that, later in the trial, the jury heard Lieutenant Nagel's statement in Davis's interview that he had information from three different agencies that incriminated Davis, which Nagel suggested confirmed for him that she was a human trafficker. The State's reference during its opening statement, while perhaps to establish the reason for the investigation, carried a clear risk of unfair prejudice when considered with other information that counsel's deficient performance allowed the jury to hear. Accordingly, we conclude that counsel's failure to move, in limine or otherwise, to prevent or limit those references in some manner was objectively unreasonable and prejudicial.

### B. Davis's Interview

¶51 Davis argues that her trial counsel was deficient by failing to object to the following portions of her interview played for the jury: (1) that "legal stuff" brought Davis to Wisconsin; (2) Lieutenant Nagel's account that he worked with a human trafficking victim who had been "assaulted about 18 times in one day" and that "the pimp that was abusing [that victim] was a horrific human being"; and (3) Nagel's statement that he had information that Davis was trying to recruit women and that he did not get "information like that from three different agencies without there being some truth to it." The State appropriately concedes that

21

counsel's failure to object to certain portions of the video "allowed questionable information to be heard by the jury."[7]

¶52    Regarding Davis's "legal stuff" statement, Davis's trial counsel testified that she considered objecting to that portion of the video but did not object because she was busy trying to figure out the time stamps for the video. Regarding Lieutenant Nagel's reference to the human trafficking victim in another case, counsel testified that she did not have a reason for not objecting other than that she was looking through her notes "in terms of what was [in] the transcript, what [she and the State] agreed wouldn't be played, and the time[]stamps." Counsel further testified that she should have objected to the State playing that portion of the video and that if she did not object, it was wrong not to do so. As to Nagel's reference to the three agencies, counsel testified that she considered objecting to that portion of the video, but she could not recall why she did not do so. Counsel further testified that she could have missed it, given that she was then searching through her notes and conferring with Davis.

¶53    To summarize, Davis's trial counsel testified that she did not object to the jury hearing certain portions of Davis's interview because counsel was trying to figure out the time stamps shown while the video of that interview was being played for the jury. The State does not show that any of the following findings of the circuit court were clearly erroneous. The court found that counsel was confused about "whether or not the time stamps that she had pre-recorded in

---

[7] The State also argues that it is unclear whether the portion of the video in which Lieutenant Nagel mentions the three agencies was actually played for the jury. The circuit court found that this portion had been played for the jury, however, and the State does not argue that the court's finding in this regard was clearly erroneous.

her preparation for trial were matching those time stamps on the video itself that was being played in front of the jury." The court also found that "there were portions of those videos of that interrogation interview which were played which [counsel] did not anticipate would be played," and this became an issue for counsel "near the beginning of the playing of the first segment of the recorded interview." As to the portions at issue, the court found that Lieutenant Nagel's reference to the three agencies was problematic and that the court had raised concerns during the trial when the State played the portion of the video in which Nagel referenced the human trafficking victim in the other case.[8] The court did not address the portion of the video regarding Davis's "legal stuff" that she said had brought her back to Wisconsin.

¶54 The circuit court concluded that Davis's trial counsel was deficient by failing to prepare and respond to the differences in the time stamps and by failing to request additional time to review the interview "to make certain that she was clear on what was going to be played and what was not." We agree with the court and independently conclude that counsel was deficient by failing to prepare for the time stamp differences and by failing to respond to those differences during the trial.

¶55 Counsel testified that she was aware of the time stamp issue early on during the playing of the interview. Despite this awareness, she did not seek

---

[8] At trial, during a break following Lieutenant Nagel's testimony, the circuit court noted to the parties that Davis's trial counsel had not objected to this portion of the interview being played, and it expressed concern that the jury had heard this portion of the interview. Counsel said that she did not want to call attention to those statements with an objection in front of the jury or a curative instruction and that the differing time stamps caused her to "miss[] it because it snuck up on me."

additional time to review the agreed-upon time stamps or object to portions of the interview being played for the jury. Put simply, counsel was inadequately prepared for a critical portion of the jury trial—that is, the playing of portions of Davis's interview with law enforcement. Her resulting confusion over the time stamps is, of course, not a reasonable strategic reason for failing to object to improper portions of the interview being played. Thus, counsel's performance with respect to the playing of the interview fell below an objective standard of reasonableness, considering all of the circumstances.

### C. Prejudice

¶56 Although some of the above deficiencies by Davis's trial counsel may not undermine confidence in the trial's outcome on their own, the effect of counsel's deficiencies, in the aggregate, does undermine our confidence in the trial's outcome. In order to convict Davis, the State had to prove beyond a reasonable doubt that: (1) Davis intended to commit the crime of human trafficking, and (2) Davis committed acts toward the commission of that crime "which demonstrate unequivocally, under all of the circumstances, that [Davis] intended to and would have committed the crime of [human trafficking] except for the intervention of another person or some other extraneous factor." *See* WIS. STAT. § 939.32(3); WIS JI—CRIMINAL 580. The completed crime of human trafficking (as opposed to the attempt charged here) requires the State to show that the defendant knowingly received compensation from the earnings of a commercial sex act. WIS. STAT. § 940.302(2)(c); WIS JI—CRIMINAL 1277.

¶57 Importantly, Davis's defense, from the moment she was arrested, was that she never intended to prostitute Holli but rather she sought only to scam Holli into thinking that Holli would be committing acts of prostitution but instead

24

Davis would take nude photos of her and sell them online. This represented a plausible theory of defense. In turn, the trial focused on Davis's intent. That is, the issue was whether her acts up to the moment she was arrested showed that Davis intended to receive compensation for trafficking Holli. The State presented the text messages between Davis and "Holli" and Davis's interview, which were strong evidence for the proposition that Davis conveyed to Holli a plan for Holli to engage in acts of prostitution. But the communications reflected in those messages were not inconsistent with—and in fact they largely dovetailed with—Davis's defense that, at the end of the day, any woman she convinced to agree to meet with her would not, in fact, be prostituted.

¶58 The problem is that the jury heard evidence that was irrelevant, inadmissible and, ultimately, quite prejudicial to Davis's defense. In addition to the text messages and admissible portions of Davis's interview, the jury heard that Lieutenant Nagel received an anonymous tip that Davis was recruiting young homeless women for prostitution, that three "agencies" confirmed that Davis was recruiting women for prostitution, that Davis was in Wisconsin at the time due to "legal stuff," and that a human trafficking victim in a completely unrelated case had been assaulted 18 times and abused by a "horrific human being."

¶59 Given that the identity of the anonymous reporter and the information surrounding the anonymous tip were privileged, Davis had no way to challenge the reference to the anonymous tip in both the State's opening statement and during Lieutenant Nagel's testimony, without seeking either a cautionary instruction limiting that reference or a ruling excluding the fact of the anonymous tip. Davis's inability to challenge the anonymous tip was further compounded when the State played the portion of her interview in which Nagel expressed the idea that there must have been some truth to the tip regarding Davis's involvement

in human trafficking because of the incriminating information he had received from three different agencies. The import of this was that four different agencies (the Appleton Police Department being one) had information about Davis being a human trafficker. Without any limitation on the reference to the anonymous tip and without the exclusion of that portion of the interview, the jury was free to consider that damaging information when determining Davis's intent.

¶60 The jury was further free to consider irrelevant evidence regarding a completely different case involving a "horrific" human trafficker and evidence that Davis was in Wisconsin due to "legal stuff." The fact that the jury heard that three agencies had "confirmed" information that Davis was trying to recruit women for prostitution and that Davis was in Wisconsin for "legal stuff," which raised the reasonable inference that the "legal stuff" was related to human trafficking, could reasonably lead the jury to believe that Davis might be just as "horrific" a trafficker as the one mentioned by Lieutenant Nagel. The evidence negatively portrayed Davis as putting young women (represented by the fictional "Holli") in a similar situation as the human trafficking victim mentioned by Nagel. And the evidence regarding the assault of a trafficking victim 18 times in one day would arouse a sense of horror in the jury and lead them to want to punish Davis merely because she was alleged to be involved in human trafficking. Such evidence was irrelevant to determining Davis's intent, yet the jury was free to consider it, and counsel failed to take sufficient efforts to exclude it.

¶61 The State contends that the text messages between Davis and "Holli" alone provided sufficient evidence to support a conviction because in those text messages, Davis mentioned sexual acts, talked about providing a hotel room and condoms, and talked about how much money Holli could make. While the text messages easily establish that Davis conveyed to Holli that she wanted Holli to

commit sexual acts, this fact still leaves the gist of the defense unanswered. This would be the plausible defense that Davis only conveyed that idea to Holli with the actual goal of taking nude photos of Holli to sell online. That defense was deeply prejudiced by her trial counsel allowing the admission of the above-discussed negative evidence. Without that negative evidence, there is a reasonable probability the jury would have had a reasonable doubt as to Davis's guilt, in light of her plausible theory of defense. *See **Sholar***, 381 Wis. 2d 560, ¶45.

¶62 Because Davis has shown that her trial counsel's multiple deficiencies prejudiced her defense, she has established that her counsel was constitutionally ineffective. We therefore reverse the judgment of conviction and that portion of the circuit court's order denying her postconviction relief on the ineffective assistance ground, and we remand the case for a new trial.

*By the Court.*—Judgment reversed; order affirmed in part, reversed in part and cause remanded for further proceedings.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.